## PCL CONSTRUCTION SERVICES, INC., Plaintiff,

v.

## UNITED STATES, Defendant.

### Nos. 95–666C, 96–442C.

United States Court of Federal Claims.

June 24, 1998.

---

Herbert L. Fenster, McKenna & Cuneo, L.L.P., Denver, CO, attorney of record for the plaintiff. Thomas Lemmer, Steven D. Olson, Kim E. Laakso, and Matthew F. Porter, of counsel.

Brian S. Smith, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, with whom were Joseph A. Kijewski, Assistant Director, David M. Cohen, Director, Civil Division, and Frank W. Hunger,, Assistant Attorney General, attorneys of record for the defendant.

## OPINION

HORN, Judge.

This matter comes before the court on the plaintiffs motion for partial summary judgment on Count X of the plaintiff's first amended complaint, submitted pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC), and on defendant's cross-motion for summary judgment on the same count. Count X of the complaint alleges that the contract between the parties was illegal due to violations of 31 U.S.C. §§ 1341, 1342, and 1502, statutes

which are directed at precluding the award of government contracts in excess of, or in advance of, appropriations and forbid the acceptance of voluntary services. Plaintiff contends that because of alleged violations of these statutes, the firm-fixed-price construction contract between the plaintiff and the government was illegal, and, thus, either void *ab initio* or voidable. In its complaint, plaintiff seeks reformation to a cost-plus-fixed-fee contract or quantum meruit relief.

Subsequently, defendant filed a motion to dismiss on both Counts IX and X, to which the plaintiff responded. Count IX asserts that the construction contract was illegal in that the government allegedly violated provisions of the Federal Acquisition Regulation (FAR), 48 C.F.R. Part 16, which address appropriate contract types. Plaintiff contends that the degree of risk and uncertainty in this procurement should have led to the award of a cost-reimbursement contract under FAR provisions, rather than a fixed-price contract. Plaintiff also argues that the failure to comply with the FAR renders the contract void *ab initio*, or, in the alternative, voidable, and seeks reformation to a cost-plus-fixed-fee contract or quantum meruit relief. Defendant's motion to dismiss contends that Counts IX and X of plaintiff's complaint fail to state claims upon which relief can be granted pursuant to RCFC 12(b)(4). Defendant argues that neither reformation nor quantum meruit is available for a contract illegal from its inception, citing *American Telephone and Telegraph Co. v. United States (AT & T)*, 124 F.3d 1471 (Fed.Cir. 1997). The judgment of the court in *AT & T* subsequently was vacated and the opinion accompanying the judgment was withdrawn. A request to rehear the appeal *en banc* has been granted by the court. *AT & T*, 136 F.3d 793 (Fed.Cir.1998).

## FACTS

On September 5, 1991 the United States Department of Interior, Bureau of Reclamation (USBR), awarded a contract to the plaintiff, PCL Construction Services, Inc. (PCL), to construct a Visitor Center and Parking Structure at the Hoover Dam, on the Nevada side of the canyon on the Colorado River. The contract type was announced in the solicitation and awarded as a firm-fixed-price contract. The original contract price was $33,854,000.00. At the time the contract was awarded, $1.3 million of the contract price was obligated to the contract. The solicitation, which was issued on June 14, 1991, included the following funding provisions:

1.5.6 52.232–19 AVAILABILITY OF FUNDS FOR THE NEXT FISCAL YEAR (APR 1984)

Funds are not presently available for performance under this contract beyond September 30, 1991. The Government's obligation for performance of this contract beyond that date is contingent upon the availability of appropriated funds from which payment for contract purposes can be made. No legal liability on the part of the Government for any payment may arise for performance under this contract beyond September 30, 1991, until funds are made available to the Contracting Officer for performance and until the Contractor receives notice of availability, to be confirmed in writing by the Contracting Officer.

1.5.7 ADMINISTRATION OF FUNDS —RECLAMATION (NOV 1984)

(a) As used in this clause, the term "earnings" is defined as any amounts due the Contractor for performance of Schedule pay items, including contract adjustments and retained percentages, adjusted by offsets for any amounts due the Government.

(b) Future availability of appropriated funds for this contract is anticipated at the following rate, which is provided for information purposes only. The Government does not warrant that all or any of the anticipated funds will be made available to the Contracting Officer for payment of earnings.

| Fiscal year | Schedule (Percent of bid) |
| --- | --- |
| Current year | $1,200,000 |
| 1992 | 61 |
| 1993 | 27 |
| 1994 | Balance |

(c) The Contracting Officer shall provide notice to the Contractor of any changes in funds available for earnings (including amount provided, period covered, and any

other limitations applicable) by contract modification under the following circumstances:

(1) When funds are made available to the Contracting Officer for payment of earnings for each fiscal year or lesser period;

(2) When the amount of funds is reduced because the Contracting Officer determines that the amount available is in excess of that required to meet all anticipated earnings prior to the next fiscal year; or

(3) When existing funds are exhausted and no additional funds will be made available.

(d) The Contractor shall notify the Contracting Officer if it appears that the funds available for earnings will be exhausted within 30 days. The Contracting Officer may, if funds can be made available, advise the Contractor of the availability of additional funds in accordance with paragraph (c) above.

(e) Payment of earnings shall be made only from such appropriated funds as are available for this contract, whether from an annual or an interim appropriations act, after such funds are received by the Contracting Officer. No payment will be made for work done after funds have been exhausted, unless and until sufficient additional funds are made available to the Contracting Officer.

(f) Prosecution of the work at a rate that will exhaust the funds available for payment of earnings before the end of the fiscal year will be at the Contractor's sole risk; however, should the Contractor so elect, it may continue the work in accordance with the terms and conditions of the contract: Provided, That funds are available for inspection and supervision, of which the Contracting Officer will so notify the Contractor. No payment will be made for interest resulting from a Contractor's election to proceed with the work after funds have been exhausted.

(g) An equitable adjustment, in performance time only, shall be made for any increase in the time required for perfor-

mance of any part of the work caused by an exhaustion of funds. However, any suspension, delay, interruption, or extension of time granted as a result of an exhaustion of funds shall not entitle the Contractor to any price adjustment under the clause of this contract entitled "Suspension of Work."

(h) If the Government fails to reserve additional funds for payment of earnings within 60 days after the beginning of a fiscal year following exhaustion of funds, the Contractor may, if it so elects, terminate this contract by written notice to the Contracting Officer. Such termination shall be at no cost to either party for the termination or as a result of the termination and shall not be subject to the terms of the "Termination for the Convenience of the Government" clause.

Two months after the solicitation was issued and prior to award of the contract. on August 16, 1991, a USBR Budget Analyst provided additional funding information on the Visitor Center and Parking Structure construction, including the following excerpt:

Funding of $33,854,000 is programmed as follows for the subject contract:

| FY 1991 | $ 1,300,000 |
| FY 1992 | 19,800,000 |
| FY 1993 | 8,800,000 |
| FY 1994 | Remainder |

Funding in fiscal years 1992, 1993, and 1994 is contingent upon passage of the Energy and Water Appriation [sic] Act.

The contract between PCL and the government was signed on September 5, 1991, and the face page included both the $33,854,000.00 figure and the above Budget Analyst's fiscal year funding schedule programmed for the contract. The funding for the Visitor Center and Parking Structure construction came from the annual Energy and Water Development Appropriation Acts. The incremental funding for the contract was reflected in a series of contract funding modifications, summarized below:

| | MODIFICATION | DATE | CHANGE (+/-) (in dollars) | FISCAL YEAR | TOTAL (in dollars) |
|---|---|---|---|---|---|
| 1. | 002 | 09/30/91 | 508,000.00 | 91 | 1,808,000.00 [1] |
| 2. | 006 | 04/01/92 | 20,042,000.00 | 92 | 21,850,000.00 |
| 3. | 017 | 09/28/92 | 2,000,000.00 | 92 | 23,850,000.00 |
| 4. | 018 | 09/29/92 | (600,000.00) | 92 | 23,250,000.00 |
| 5. | 049 | 09/30/93 | (630,000.00) | 93 | 22,620,000.00 |
| 6. | 061 | 02/04/94 | 1,600,000.00 | 94 | 24,220,000.00 |
| 7. | 062 | 02/10/94 | 5,700,000.00 | 94 | 29,920,000.00 |
| 8. | 065 | 03/22/94 | 5,100,000.00 | earnings [2] | 35,020,000.00 |
| 9. | 104 | 09/29/94 | 775,000.00 | earnings | 35,795,000.00 |
| 10. | 113 | 12/02/95 | 1,000,000.00 | earnings | 36,795,000.00 |
| 11. | 117 | 01/09/95 | 300,000.00 | earnings | 37,095,000.00 |
| 12. | 125 | 03/24/95 | 305,000.00 | earnings | 37,400,000.00 |
| 13. | 129 | 05/09/95 | 10,000.00 | earnings | 37,410,000.00 |
| 14. | 130 | 05/16/95 | 10,000.00 | earnings | 37,420,000.00 |
| 15. | 134 | 07/26/95 | 224,573.00 | earnings | 37,644,573.00 |
| 16. | 141 | 09/07/95 | 250,000.00 | earnings | 37,899,573.00 [3] |
| 17. | 144 | 10/03/95 | 30,000.00 | earnings | 37,929,573.00 [4] |

---

Plaintiff contends that funding this project in the incremental fashion reflected in the chart above was illegal because the contract created obligations in excess of, and in advance of, available appropriations to fund the obligations. Defendant argues, however, that the contract and its funding were legal, in that section 12 of the Reclamation Project Act of 1939, 43 U.S.C. § 388 (1994), expressly authorizes incremental funding "in which the

1. The following example can be used to explain the contract funding modification chart above. The contract was signed on September 5, 1991, obligating $1,300,000.00. Modification 002, dated September 30, 1991, added $508,000.00 for Fiscal Year 1991, bringing the total amount of funding obligated at that point to $1,808,000.00.

2. The remainder of the funding modifications provided that the additional dollar amounts were "now reserved to cover payment of all earnings under the contract." "Earnings" is defined in contract clause 1.5.7(a), Administration of Funds—Reclamation (Nov 1984), reproduced above.

3. One or more funding modifications totaling $5,000.00 appear to be missing from the record submitted to the court because the total of $37,-644,573.00, plus the increment of $250,000.00, requires another $5,000.00 to total $37,899,-573.00.

4. The difference between the original contract amount of $33,854,000.00 and the total amount as reflected in this chart, $37,929,573.00, was for amounts to cover changed or additional work, incorporated into the contract through modifications.

liability of the United States shall be contingent upon appropriations being made therefor." The contract as signed also contained the "subject to the availability of funds" clause reproduced verbatim above, which provided that the government's obligation under the contract "is contingent upon the availability of appropriated funds." That clause provided that no legal liability on the part of the government arises "until funds are made available to the Contracting Officer" and "until the Contractor receives notice of availability [of funds], to be confirmed in writing by the Contracting Officer." 48 C.F.R. § 52.232–19 (1990).

## DISCUSSION

The parties filed cross-motions for summary judgment on Count X of the complaint, and defendant subsequently filed a motion to dismiss both Counts IX and X. The earlier filed cross-motions for summary judgment will be addressed first.

Summary judgment in this court should be granted only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Rule 56 of the Rules of the Court of Federal Claims (RCFC) is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed. R.Civ.P.) and is similar in language and effect.[5] Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

RCFC 56(c) provides that in order for a motion for summary judgment to be granted, the moving party bears the burden of demonstrating that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970);

*Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994); *Meyers v. Asics Corp.*, 974 F.2d 1304, 1306 (Fed.Cir.1992); *Lima Surgical Assocs., Inc. Voluntary Employees' Beneficiary Ass'n Plan Trust v. United States*, 20 Cl.Ct. 674, 679 (1990), *aff'd*, 944 F.2d 885 (Fed.Cir.1991); *Rust Communications Group, Inc. v. United States*, 20 Cl.Ct. 392, 394 (1990). Disputes over facts which are not outcome determinative under the governing law will not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury [trier of fact] could return a verdict for the nonmoving party." *Id. see also Uniq Computer Corp. v. United States*, 20 Cl.Ct. 222, 228–29 (1990).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Cloutier v. United States*, 19 Cl.Ct. 326, 328 (1990), *aff'd*, 937 F.2d 622 (Fed.Cir.1991). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 250–52, 106 S.Ct. 2505. When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Stated otherwise, if the nonmoving party cannot present evidence to support its case under any scenario, then there should be no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings.

---

5. In general, the rules of this court are patterned on the Federal Rules of Civil Procedure. Therefore, precedent under the Federal Rules of Civil Procedure is relevant to interpreting the rules of this court, including RCFC 56. *See Jay v. Secre-*

*tary of DHHS*, 998 F.2d 979, 982 (Fed.Cir.1993); *Imperial Van Lines Int'l, Inc. v. United States*, 821 F.2d 634, 637 (Fed.Cir.1987); *Lichtefeld-Massaro, Inc. v. United States*, 17 Cl.Ct. 67, 70 (1989).

If, however, the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Id.; see also Litton Indus. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163 (Fed.Cir.1985); *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1574 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

The initial burden on the party moving for summary judgment, to produce evidence showing the absence of a genuine issue of material fact, may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Lima Surgical Assocs.*, 20 Cl.Ct. at 679. If the moving party makes such a showing, the burden then shifts to the nonmoving party to demonstrate that a genuine factual dispute exists by presenting evidence which establishes the existence of an element of its case upon which it bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. at 322, 106 S.Ct. 2548; *Lima Surgical Assocs.*, 20 Cl.Ct. at 679.

Pursuant to RCFC 56, the motion for summary judgment may succeed, whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party will need to go beyond the pleadings, by use of evidence such as affidavits, depositions, answers to interrogatories, and admissions. *Id.*

The fact that both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however. does not relieve the court of its responsibility to determine the appropriateness of summary disposition in the particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also Levine v. Fairleigh Dickinson Univ.*, 646 F.2d 825, 833 (3d Cir.1981); *Home Ins. Co. v. Aetna Casualty & Sur. Co.*, 528 F.2d 1388, 1390 (2d Cir.1976). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir.1968); *Bataco Indus., Inc. v. United States*, 29 Fed. Cl. 318, 322 (1993), *aff'd*, 31 F.3d 1176 (Fed. Cir.1994). The court must evaluate each party's motion on its own merit, taking care to draw all reasonable inferences against the party whose motion is under consideration. *Mingus Constructors, Inc.*, 812 F.2d at 1391.

In the above-captioned case, the parties have filed joint stipulations of fact, and agree that summary judgment disposition on Count X is appropriate. Moreover, no issues have been identified by the parties or the court which raise material issues of disputed fact. The plaintiff relies on several fiscal control statutes, allegedly violated by the contract for the Visitor Center and Parking Structure, to support its motion for partial summary judgment. The key fiscal statute, the Antideficiency Act, provides in part that:

> (a)(1) An officer or employee of the United States Government or of the District of Columbia government may not—
>
> > (A) make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation; [or]
> >
> > (B) involve either government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law....

31 U.S.C. § 1341(a)(1) (1994). Plaintiff further cites the Adequacy in Appropriations Act for a similar constraint:

(a) No contract or purchase on behalf of the United States shall be made, unless the same is authorized by law or is under an appropriation adequate to its fulfillment. . . .

41 U.S.C. § 11(a) (1994). Plaintiff also submits an Antideficiency Act provision which limits acceptance of voluntary services:

An officer or employee of the United States Government or of the District of Columbia government may not accept voluntary services for either government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property.

31 U.S.C. § 1342 (1994).

■ In addition to these statutes, plaintiff cites the rule which provides that annual appropriations may be used only to meet the "bona fide" needs of the fiscal year for which the appropriation was made:

§ 1502. Balances available

(a) The balance of an appropriation or fund limited for obligation to a definite period is available only for payment of expenses properly incurred during the period of availability or to complete contracts properly made within that period of availability and obligated consistent with section 1501 of this title. However, the appropriation or fund is not available for expenditure for a period beyond the period otherwise authorized by law.

31 U.S.C. § 1502 (1994).

Funds have been classified on the basis of "duration" of appropriations as annual funds, multiple-year funds, and no-year funds. *See* General Accounting Office (GAO), 1 *Principles of Federal Appropriations Law* 5–3, 5–6 (2d ed.1991). The bona fide needs rule is a function of "annual" funds. The funding utilized to support the contract at issue in the case at bar, however, was from "no-year" appropriations, which are available for obligation without fiscal year limitation. *See* Energy and Water Development Appropriations Act, 1990, Pub.L. No. 101–101, 103 Stat. 641, 652 (Title II) (1989); Energy and Water Development Appropriations Act, 1991, Pub.L. No. 101–514, 104 Stat.2074, 2083 (Ti-

tle II) (1990); Energy and Water Development Appropriations Act, 1992, Pub.L. No. 102–104, 105 Stat. 510, 521 (Title II) (1991); Energy and Water Development Appropriations Act, 1993, Pub.L. No. 102–377, 106 Stat. 1315, 1327 (Title II) (1992); Energy and Water Development Appropriations Act, 1994, Pub.L. No. 103–126, 107 Stat. 1312, 1323 (Title II) (1993); Energy and Water Development Appropriations Act, 1995, Pub.L. No. 103–316, 108 Stat. 1707, 1712 (Title II) (1994). Therefore, 31 U.S.C. § 1502 is inapplicable to the case at bar which funded the contract from no-year funds. *See* GAO, 1 *Principles of Federal Appropriations Law* 5–13.

Other than 31 U.S.C. § 1502, the statutory framework relied on by the plaintiff generally precludes government agencies from contracting for goods and services in excess of amounts appropriated, or in advance of an appropriation, unless otherwise authorized by law, and also precludes agencies, absent emergency conditions, from accepting voluntary services. Against this statutory framework, plaintiff contends that:

The USBR entered into a contract for a major construction project with a price of over $30 million with only $1.3 million of available funding. As with any fixed-price contract, the Contract purported to obligate the contractor to complete all contract objectives without regard to the costs of performance. Thus, the USBR entered into a contract for the future payment of money in advance of and in excess of available appropriations. Further, the contract was not supported by funds adequate to its fulfillment. Absent special authority, such a contract violates 31 U.S.C. § 1341 and 41 U.S.C. § 11(a).

The plaintiff acknowledges that the contract in question contained a "subject to the availability of funds" clause, which purported to make the government's obligation contingent upon the availability of appropriated funds, and explicitly declared that no liability would arise on the part of the government until such funds were made available to the contracting officer, and until the contracting officer confirmed the funding by written no-

tice to the contractor. 48 C.F.R. § 52.232–19 (1990).

Plaintiff argues, however, that the "subject to the availability of funds" clause was ineffective in assuring compliance with the Antideficiency Act. Plaintiff relies on language in the GAO's treatise on appropriations law, *Principles of Federal Appropriations Law:*

> If a "subject to availability" clause were sufficient to permit multi-year contracting, the effect would be automatic continuation from year to year unless the government terminated. If funds were not available and the government nevertheless permitted or acquiesced in the continuation of performance, the contractor would obviously be performing in the expectation of being paid. Apart from questions of legal liability, the failure by Congress to appropriate the money would be a serious breach of faith. Congress would, as a practical, if not a legal matter, have little real choice. This is another example of a type of "coercive deficiency" the Antideficiency Act was intended to prohibit. *Thus, it is not enough for the government to retain the option to terminate at any time if sufficient funds are not available.*

GAO, 2 *Principles of Federal Appropriations Law* 6–27 (2d ed.1992) (footnote omitted) (emphasis added). In its brief to the court, although the plaintiff underlined the last sentence reproduced above, the GAO treatise selection quoted by plaintiff was from a paragraph which began with a discussion of *Leiter v. United States,* 271 U.S. 204, 46 S.Ct. 477, 70 L.Ed. 906 (1926). Moreover, PCL omitted the next two sentences in the paragraph which state: "[u]nder *Leiter* and its progeny, the contract 'dies' at the end of the fiscal year, and may be revived only by affirmative action by the government. This 'new' contract is then chargeable to appropriations for the subsequent year." GAO, 2 *Principles of Federal Appropriations Law* 6–27. In *Leiter,* a government agency had entered into several leases for office space with terms of four and five years. Annual funds covered only the first year, and the lease terms for the next several years were specifically made contingent upon appropriations for those years. The United States Supreme Court found an Antideficiency Act violation in the leases beyond the first year and wrote: "[a] lease to the Government for a term of years, when entered into under an appropriation available for but one fiscal year, is binding on the Government only for that year." *Leiter v. United States,* 271 U.S. at 207, 46 S.Ct. 477 (citing *McCollum v. United States,* 17 Ct.Cl. 92, 104, 1800 WL 986 (1881); *Smoot v. United States,* 38 Ct.Cl. 418, 427, 1902 WL 1112 (1903)).

In contrast, the instant action involves "no-year" appropriations, available for obligation without fiscal year limitation. Furthermore, the case at bar raises a provision of the Reclamation Project Act of 1939, that authorizes multi-year contracts, "in which the liability of the United States shall be contingent upon appropriations being made therefor." 43 U.S.C. § 388 (1994). In addition, the "subject to the availability of funds" clause employed in the PCL contract is a relatively rigorous provision, as noted by the same GAO treatise on the *Principles of Federal Appropriations Law* on which the plaintiff relies. After discussing the deficiencies of the "subject to the availability of funds" clause in *Leiter,* the GAO's discussion continues:

> This is not to say that "subject to availability" clauses are not important. They are, and are in fact required by the Federal Acquisition Regulation in several situations: (1) contract actions initiated prior to the availability of funds; (2) certain requirements and indefinite-quantity contracts; (3) fully funded cost-reimbursement contracts; (4) facilities acquisition and use; and (5) incrementally funded cost-reimbursement contracts. FAR, 48 C.F.R. Subpart 32.7. While the prescribed contract clauses vary in complexity, they all have one thing in common—*each requires the contracting officer to specifically notify the contractor of the availability of funds and to confirm the notification in writing. The objective of these clauses is compliance with the Antideficiency Act and other funding statutes ....* What is not sufficient is a simple "subject to availability" clause which would permit automatic continuation subject to the government's right to terminate.

GAO, 2 *Principles of Federal Appropriations Law* 6–27, 6–28 (citations omitted) (footnotes omitted) (emphasis added). In fact, the "subject to availability of funds" clause at FAR 52.232–19, used in the PCL contract and referenced in the GAO treatise selection directly above, requires the contracting officer to notify the contractor of the availability of funds and to confirm the notification in writing. *See id.* at 6–28 n. 23.

■ Plaintiff, however, argues that the "subject to the availability of funds" clause in FAR 52.232–19 was not authorized for inclusion in the contract in question. PCL contends that the clause could only be used in specialized contracting situations—in a one-year, indefinite-quantity or requirements contract for services, funded with annual appropriations, but extending beyond the initial fiscal year. *See* 48 C.F.R. §§ 32.703–2(b), 32.705–1(b), 52.232–19 (1990). The clause at FAR 52.232–19 is required by the FAR to be used for such contracts, but there is no specific prohibition in the FAR regulations on the clause's alternative use. In contrast, the use of the availability of funds clause at FAR 52.232–18 is limited by specific language included in the FAR provision: "[t]his authority may be used *only* for operation and maintenance and continuing services...." 48 C.F.R. § 32.703–2(a) (1990) (emphasis added). Therefore, the clause at FAR 52.232–19, which does not contain such a restriction, is more generic, and may be used beyond the specialized contracting situations—indefinite-quantity or requirements contracts for services—for which it is required.

■ Use of a contract clause which is inconsistent with the FAR is defined as a FAR "deviation," requiring approval by the agency head or designee, and for class deviations, consultation and coordination as prescribed by the FAR. 48 C.F.R. §§ 1.401, 1.403, 1.404 (1990). The instant record does not reflect that a deviation was sought or approved by the USBR, or that a deviation was required. However, even if the plaintiff could demonstrate an "inconsistent" use of the clause at FAR 52.232–19, the plaintiff cannot demonstrate prejudice from use of the "subject to availability of funds" clause to implement the funding provisions of the Reclamation Pro-

ject Act, 43 U.S.C. § 388, nor demonstrate lack of compliance with the Antideficiency Act. Use of the "subject to the availability of funds" clause in question was apparent on the face of the solicitation, so that any objections on the part of the plaintiff or any other offeror to the use of the clause or failure to follow FAR administrative procedures should have been raised prior to the submission of bids. Absent timely objection, the issue is waived. *See Community Heating & Plumbing Co., Inc. v. Kelso,* 987 F.2d 1575, 1579–80 (Fed.Cir.1993); *Beacon Const. Co. v. United States,* 161 Ct.Cl. 1, 6–7, 314 F.2d 501 (1963); *Aerolease Long Beach v. United States,* 31 Fed.Cl. 342, 358 (1994), *aff'd,* 39 F.3d 1198 (Fed.Cir.1994).

■ Moreover, if the plaintiff had formally objected or protested in timely fashion to the inclusion in the solicitation of the particular "subject to the availability of funds" clause, the standards in *Keco Indus., Inc. v. United States,* 203 Ct.Cl. 566, 492 F.2d 1200 (1974) (*Keco II*) would have been applicable. The United States Court of Claims, in *Keco II* set forth four factors to be considered when determining whether the government has acted arbitrarily or capriciously to a bidder-claimant: (1) whether there was subjective bad faith on the part of the procuring officials, thus, depriving the bidder of fair and honest consideration of its proposal; (2) whether there was a reasonable basis for the administrative decision; (3) the degree of discretion given to the procurement officials by applicable statutes and regulations which, under *Keco II,* determines the degree of proof of error necessary to demonstrate a right to recovery; and (4) whether government officials violated pertinent statutes or regulations, which, if violated, may form the basis for recovery, but need not do so automatically. *Id.* at 574, 492 F.2d at 1203–04; *see also E.W. Bliss Co. v. United States,* 77 F.3d 445, 447 (Fed.Cir.1996); *Aerolease Long Beach v. United States,* 31 Fed. Cl. at 355–56; *Burroughs Corp. v. United States,* 223 Ct.Cl. 53, 64–65, 617 F.2d 590, 597 (1980) (applying *Keco II* criteria). To establish an abuse of discretion, case authority requires both a violation of applicable statute or regulation, and resulting prejudice to the

protester. According to the United States Court of Appeals for the Federal Circuit:

> As Data General recognizes, to prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it. *See LaBarge Prods., Inc. v. West,* 46 F.3d 1547, 1556 (Fed.Cir.1995) ("Even though the disclosures to Victaulic clearly violated the FAR.... LaBarge was not harmed by the disclosures in any concrete way contemplated by the FAR and, therefore, is not entitled to relief."); *Central Ark. Maintenance, Inc. v. United States,* 68 F.3d 1338, 1342 (Fed.Cir.1995) (stating in a pre-award bid protest that "not all violations of statute and regulation are the same; only a 'clear and prejudicial' violation of a procurement statute or regulation warrants relief"); *Cleveland Telecommunications Corp. v. Goldin,* 43 F.3d 655, 659 (Fed.Cir.1994) (a possible regulatory violation "did not prejudice [pre-award bid protester] in any way and does not provide grounds for terminating the procurement"); *CACI Field Servs., Inc. v. United States,* 854 F.2d 464, 466 (Fed.Cir.1988) (aggrieved bidder in a pre-award bid protest "was required to prove at trial a 'clear and prejudicial' violation of a procurement statute or regulation"); *TRW Envtl. Safety Sys., Inc. v. United States,* 18 Cl.Ct. 33, 67 (1989) ("Generally, the requirement of proving prejudice prevents an unsuccessful bidder from overturning a contract award due to a harmless violation of a statute or regulation on the part of the government").

*Data General Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996).

The record reflects no prejudice to PCL through the use of the particular "subject to the availability of funds" clause selected by the contracting officer to implement the incremental funding authority of the Reclamation Project Act and to insure compliance with the Antideficiency Act. All bidders had notice of the same clause in the solicitation. Any allegation that the FAR clause-approval procedure was not followed should have been raised prior to submission of bids, rather than subsequent to contract completion.

In addition, the FAR does not explicitly provide a contract clause to be used for a firm-fixed-price, incrementally funded, construction contract utilizing no-year appropriations. The "subject to the availability of funds" clause at FAR 52.232–18 is explicitly limited by the FAR to a particular contracting scenario. Given that the clause at FAR 52.232–19 and other sections of the FAR contain no prohibitions on the use of 52.232–19 in contracts other than indefinite-quantity and requirements contracts, for which the clause specifically is required, the USBR was not barred from using the language of 52.232–19 in the PCL contract.

Plaintiff also contends that government's reliance on the special funding authorization contained in section 12 of the Reclamation Project Act of 1939 is misplaced. The statute, 43 U.S.C. § 388, provides that:

> When appropriations have been made for the commencement or continuation of construction or operation and maintenance of any project, the Secretary may, in connection with such construction or operation and maintenance, enter into contracts for miscellaneous services, for materials and supplies, as well as for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor.

Act of August 4, 1939, ch. 418, § 12, 53 Stat. 1197 (codified at 43 U.S.C. § 388 (1994)).

Defendant contends that 43 U.S.C. § 388 has been interpreted by the USBR as permitting incrementally funded contracts, and that an interpretation by an agency charged with implementing a statute should be accorded great weight, relying on *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694, *reh'g denied,* 468 U.S. 1227, 105 S.Ct. 28, 82 L.Ed.2d 921 (1984).[6]

---

**6.** *See also Regions Hosp. v. Shalala,* —— U.S. ——, 118 S.Ct. 909, 915, 139 L.Ed.2d 895 (1998); *Good Samaritan Hosp. v. Shalala,* 508 U.S. 402, 417–18, 113 S.Ct. 2151, 124 L.Ed.2d 368 (1993);

*National R.R. Passenger Corp. v. Boston and Maine Corp.,* 503 U.S. 407, 417, 112 S.Ct. 1394, 118 L.Ed.2d 52 (1992) ("Judicial deference to reasonable interpretations by an agency of a stat-

Defendant cites the following agency memorandum and decisions to the court as evidence that the Department of Interior for many years has interpreted 43 U.S.C. § 388 as authorizing incremental funding of USBR construction projects: Memorandum from the Associate Solicitor, Energy and Resources to Deputy Assistant Secretary— Land and Water Resources, on "Proposed Contract with De Luz Heights Municipal Water District, California, for Repayment of Small Reclamation Projects Loan," Sept. 7, 1977; *Appeal of S.A. Healy Co.*, 81 Interior Dec. 354, 1974 WL 1366 (1974); *Appeal of Granite Construction Co.*, 79 Interior Dec. 644, 1972 WL 1082 (1972); *Stoppage of Work on Friant–Kern Canal*, 60 Interior Dec. 113 (1948). However, these historical agency interpretations do not clearly address all of the issues raised by the plaintiff in the case at bar, including some of those raised by the incremental funding of firm-fixed-price contracts and compliance with the Antideficiency Act. The GAO's *Principles of Federal Appropriations Law*, however, includes the following discussion on 43 U.S.C. § 388:

It should again be emphasized that to constitute an exception to 31 U.S.C. § 1341(a), the "contract authority" must be specific authority to incur the obligation in excess or advance of appropriations, not merely the general authority any agency has to enter into contracts to carry out its functions.

Congress may grant authority to contract beyond the fiscal year in terms which amount to considerably less that the type of "contract authority" described above. An example is 43 U.S.C. § 388, which authorizes the Secretary of the Interior to enter into certain contracts relating to reclamation projects "which may cover such periods of time as the Secretary may con-

sider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor." While this provision has been referred to as an exception to the Antideficiency Act (B–72020, January 9, 1948), it authorizes only "contingent contracts" under which there is no legal obligation to pay unless and until appropriations are provided. 28 Comp. Gen. 163 (1948). A similar example, discussed in B–239435, August 24, 1990, is 38 U.S.C. § 230(c) (Supp. II 1990), which authorizes the Department of Veterans Affairs to enter into certain leases for periods of up to 35 years but further provides that the government's obligation to make payments is "subject to the availability of appropriations for that purpose."

GAO, 2 *Principles of Federal Appropriations Law* 6–53. The court agrees with the discussion in the GAO treatise on appropriations law, and with the consistent sense of the agency interpretations regarding the authorization intended by 43 U.S.C. § 388.

Plaintiff argues that the legislative history of 43 U.S.C. § 388 included the following statement by the Commissioner of the USBR:

Section 12 would permit purchases of construction materials on a more economical plan than is apparently now possible.

By reason of a ruling of the Comptroller General, which appears in 9 C.G. 6, the Bureau of Reclamation has not been permitted to make supply contracts calling for performance over a period extending beyond the current fiscal year. The result of the Comptroller's decision in 9 C.G. 6, in one contract relating to the Owyhee project, was that the United States had to pay $175,000 more for 500,000 barrels of ce-

ute that it administers is a dominant, well-settled principle of federal law. We relied upon it in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, and have reaffirmed it often.") (citations omitted); *American Broadcasting Companies, Inc. v. United States*, 129 F.3d 1243, 1245 (1997); *British Steel PLC v. United States*, 127 F.3d 1471, 1475 (Fed.Cir.1997); *Arbor Foods Inc. v. United States*, 97 F.3d 534, 538–39 (Fed. Cir.1996); *Balick v. OPM*, 85 F.3d 586, 588 (Fed. Cir.1996) ("The interpretation of a statute by the agency charged with its implementation is enti-

tled to substantial deference and we sustain the agency's interpretation if it is reasonable and not at variance with the plain meaning of the statute."); *Begley v. OPM*, 60 F.3d 804, 806 (Fed.Cir. 1995); *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1570 (Fed.Cir.1994) ("To survive judicial scrutiny, an agency's construction need not be the only reasonable interpretation or even the most reasonable interpretation. Rather, a court must defer to an agency's reasonable interpretation of a statute even if the court might have preferred another.") (citation omitted).

ment (purchased periodically in partial quantities) than it would have had to pay under the proposed contract for the entire quantity of 500,000 barrels. The desirability of the authority which would be granted by section 12 is obvious.

Reclamation Act of 1939: Hearings on H.R. 6773 before the House Comm. on Irrigation and Reclamation, 76th Cong. 27 (1939) (statement of John C. Page, Commissioner, USBR). With this one example noted in the legislative history in mind, plaintiff reads the broad language of the statute to limit entering into incremental contracts only to those situations "in connection with" or ancillary to an underlying capital construction project, with the underlying capital construction project required to be fully funded. Plaintiff argues that the Visitor Center and Parking Structure construction are not ancillary projects, but are listed in the government's internal budget documents as "major" and, thus, are the types of projects which must be fully funded.

 If a statute is plain and unequivocal on its face, there is no need to resort to the legislative history underlying the statute. *Reid v. Dep't of Commerce*, 793 F.2d 277, 281 (Fed.Cir.1986) (citing *United States v. Oregon*, 366 U.S. 643, 648, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961), *reh'g denied*, 368 U.S. 870, 82 S.Ct. 24, 7 L.Ed.2d 70 (1961)). "The starting point in every case including construction of a statute is, or ought to be, the language itself." *Dillon, Read & Co., Inc. v. United States*, 875 F.2d 293 (Fed.Cir.1989) (citing *Commissioner v. Engle*, 464 U.S. 206, 214, 104 S.Ct. 597, 78 L.Ed.2d 420 (1984); *Neptune Mutual Assoc., Ltd. of Bermuda v. United States*, 862 F.2d 1546, 1549 (Fed.Cir. 1988)). A court should resort to legislative history only if:

a literal interpretation would lead to an incongruous result. For example, if a literal reading of the statute would impute to Congress an irrational purpose, *United States v. Bryan*, 339 U.S. 323, 338, 70 S.Ct. 724, 734, 94 L.Ed. 884 (1950), or would thwart the obvious purpose of the statute, *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978), or would lead to a

result at variance with the policy of the legislation as a whole, *Trustees of Indiana University v. United States*, 618 F.2d 736, 739, 223 Ct.Cl. 88, 94 (1980), then literal interpretation will be eschewed in favor of resort to the legislative history to ascertain the intent of Congress. *United States v. Oregon*, 366 U.S. at 648, 81 S.Ct. at 1281; 2A Sands § 46.07.

*Reid v. Dep't of Commerce*, 793 F.2d at 281–82. *Accord Brookside Veneers, Ltd. v. United States*, 847 F.2d 786, 788 (Fed.Cir.1988) ("It is a general rule of statutory construction that where Congress has clearly stated its intent in the language of a statute, a court should not inquire further") (citing *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 570, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980); *Reid v. Dep't of Commerce*, 793 F.2d 277, 281–82 (Fed.Cir.1986)); *Alaskan Arctic Gas Pipeline Co. v. United States*, 831 F.2d 1043, 1046 (Fed.Cir.1987) ("It is well established, in cases involving statutory construction, that the statutory language itself is the best indication of congressional intent") (citing *Brant v. United States*, 220 Ct.Cl. 65, 597 F.2d 716, 718 (1979); *Carrier Corp. v. United States*, 208 Ct.Cl. 678, 534 F.2d 244, 249 (1976)). In the instant case, the USBR statute, 43 U.S.C. § 388, is plain and unequivocal on its face, and resort to legislative history is unnecessary.

 In the opinion of the court, the plaintiff reads too much into the statutory phrase "in connection with" in 43 U.S.C. § 388, when it tries to develop a distinction between "ancillary" contracts and "major" contracts. Plaintiff argues that only "ancillary" contracts may be incrementally funded, but that contracts such as the PCL contract must be fully funded. Significantly, the statute does not contain plaintiff's words "ancillary" or "major" nor the word "minor." Moreover, the words of the statute are clear on their face:

When appropriations have been made for *the commencement or continuation of construction* or operation and maintenance of *any project*, the Secretary may, *in connection with such construction* or operation

and maintenance, enter into contracts for miscellaneous services, for materials and supplies, as well as for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor.

43 U.S.C. § 388 (emphasis added).

The Boulder Canyon Project was commenced in 1928, with the Hoover Dam as the principal feature of the project. Boulder Canyon Project Act of 1928, 45 Stat. 1057, codified as amended, 43 U.S.C. § 617 *et seq.* (1994). *See also* H.R. Rep No. 98–648, at 9–10 (1984), *reprinted in* 1984 U.S.C.C.A.N. 2479, 2480. Subsequently, in the Hoover Power Plant Act of 1984, the Secretary of the Interior was authorized:

> to improve parking, visitor facilities, and roadways and to provide additional elevators, and other facilities that will contribute to the safety and sufficiency of visitor access to Hoover Dam and Powerplant (hereinafter in this Act referred to as *"visitor facilities program"*).

Pub.L. No. 98–381, § 101(a), 98 Stat. 1333 (1984) (codified at 43 U.S.C. § 619 (1994)) (emphasis added). The visitor center and parking structure construction obviously is linked to and one of the construction components of the Boulder Canyon Project. The 1984 statute continues:

> SEC. 103. (a) The Boulder Canyon Project Act of 1928 (45 Stat. 1057, as amended, 43 U.S.C. § 617 et seq.), as amended and supplemented, is further amended:
>
> \* \* \* \* \* \*
>
> (2) In section 3, by deleting "$165,000,-000." and inserting in lieu thereof "$242,-000,000, of which $77,000,000 (October 1983 price levels) shall be adjusted plus or minus such amounts as may be justified by reason of ordinary fluctuations of construction costs as indicated by engineering cost indices applicable to the

type of construction involved herein. Said $77,000,000 represents the additional amount required for the uprating program and visitor facilities program."

Pub.L. No. 98–381, § 103(a)(2), 98 Stat. 1334 (1984) (codified at 43 U.S.C. § 617b (1994)).[7] Furthermore, the same statute states: "(b) Except as amended by this Act, the Boulder Canyon Project Act of 1928 (45 Stat. 1057, as amended, 43 U.S.C. § 617 et seq.), as amended and supplemented, shall remain in full force and effect." Pub.L. 98–381, § 103(b), 98 Stat. 1334 (1984). The record reflects nine contracts awarded between early 1986 and late 1995 for the visitor center facilities program, including the contract awarded to plaintiff on September 5, 1991. Plaintiffs construction contract was "in connection with" the Boulder Canyon Project, and thus may be incrementally funded under the authority of 43 U.S.C. § 388.

Citing *I.N.S. v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), in a footnote to one of its briefs submitted to the court, plaintiff tries to analogize to the case at bar and argues, based on a separation of powers theory, that:

> to the extent section 388 appears to authorize the executive branch to incur unfunded obligations on behalf of the government. the provision is unconstitutional in that it violates Article I, Section 9 clause 7 [of the United States Constitution] and is an unconstitutional delegation of the appropriation authority to the executive branch.

In *Chadha,* the United States Supreme Court struck down as unconstitutional a provision in immigration law providing for congressional veto of an executive branch deportation decision. *Id.* at 959, 103 S.Ct. 2764. The Court held that congressional action under the statute was an exercise of legislative power subject to the United States Constitution Article I, Section 7 standards, such as the requirements of bicameral action and presentment to the President, and that these

---

**7.** The court also notes that the title "Boulder Canyon Project" was used consistently to refer to the contract ultimately awarded to PCL. The funding programmed for the PCL contract was reflected in an August 16, 1991 memorandum, reproduced earlier, and drafted by a "Budget Analyst, Boulder Canyon Project." Furthermore, the cover page of the solicitation incorporated into the contract awarded to PCL was entitled, "Visitor Center and Parking Structure, Hoover Visitor Facilities, Boulder Canyon Project, Nevada."

requirements were not met. *Id.* at 952–59, 103 S.Ct. 2764. In the case at bar, plaintiff tries to rely on Article I, Section 9, clause 7, which provides that no money shall be drawn from the Treasury absent lawful appropriations. U.S. Const. art. I, § 9, cl. 7. In this regard, 43 U.S.C. § 388, a statute in which Congress explicitly provides that "the liability of the United States shall be contingent upon appropriations being made [by Congress]," retains appropriation authority with the Congress and passes constitutional muster.

 The court has concluded, for the reasons described above, that 43 U.S.C. § 388 is applicable to the contract in question, and that the statute authorizes incremental funding for the Boulder Canyon Project for construction of the Visitor Center and Parking Structure. Plaintiff, however, contends that even if the statute was found by the court to be applicable, the underlying contract in the case at bar violates the prohibitions against encouraging contractors to work after exhaustion of funds, creating non-contingent liabilities and the acceptance of voluntary services from contractors. In this regard, the FAR provides that:

> (c) Government personnel encouraging a contractor to continue work in the absence of funds will incur a violation of Revised Statutes Section 3679 (31 U.S.C. § 1341) that may subject the violator to civil or criminal penalties.

48 C.F.R. § 32.704(c) (1990). The FAR admonition has two prongs: (1) encouraging a contractor to continue working, and (2) in the absence of funds. The cited statutory section, 31 U.S.C. § 1341, is only one of the relevant provisions of the Antideficiency Act; section 1342 is the other. Regarding section 1342, the GAO treatise provides that:

> Section 1342 covers any type of service which has the effect of creating a legal or moral obligation to pay the person rendering the service. Naturally, this includes government contractors. The prohibition includes arrangements in which government contracting officers solicit or permit—tacitly or otherwise—a contractor to continue performance on a "temporarily unfunded" basis while the agency, which

has exhausted its appropriations and can't pay the contractor immediately, seeks additional appropriations.

GAO, 2 *Principles of Federal Appropriations Law* 6–68 (2d ed.1992). The related concept of "coercive deficiencies" is explained in the same GAO treatise:

> As with the series of funding statutes as a whole, the Antideficiency Act did not hatch fully grown but evolved over a period of time in response to various abuses. As we noted in Chapter 1, as late as the post-Civil War period, it was not uncommon for agencies to incur obligations in excess of or in advance of appropriations. Perhaps most egregious of all, some agencies would spend their entire appropriations during the first few months of the fiscal year, continue to incur obligations, and then return to Congress for appropriations to fund these "coercive deficiencies." These were obligations to others who had fulfilled their part of the bargain with the United States and who now had at least a moral—and in some cases also a legal—right to be paid. Congress felt it had no choice but to fulfill these commitments, but the frequency of deficiency appropriations played havoc with the United States budget.

GAO, 2 *Principles of Federal Appropriations Law* 6–9 (2d ed.1992) (footnote omitted). *See also Project Storm Fury,* 59 Comp. Gen. 369, 371–72 (B–198206) (1980).

Although the defendant argues that an exhaustion of funds did not actually occur in the case at bar and that funding was adequate to cover all obligations, plaintiff argues that the contract nevertheless created "non-contingent liabilities," and focuses on the contract's "Administration of Funds—Reclamation (November 1984)" clause, included in the contract (and reproduced in the Facts section of this opinion). The "Administration of Funds—Reclamation" clause indicates at paragraph 1.5.7(b) that the government does not warrant that "all or any of the anticipated funds" will be made available to the contract. Paragraph 1.5.7(c)(1) provides that the contracting officer shall provide notice to the contractor when funds are available. Paragraph 1.5.7(c)(3) provides that the contracting officer shall provide notice to the

contracting officer "[w]hen existing funds are exhausted and no additional funds will be made available." Paragraph 1.5.7(d) provides that "[t]he Contractor shall notify the Contracting Officer if it appears that the funds available for earnings will be exhausted within 30 days."[8] Paragraph 1.5.7(e) provides that "[n]o payment will be made for work done after funds have been exhausted, unless and until sufficient additional funds are made available to the Contracting Officer." Paragraph 1.5.7(f) of the Administration of Funds clause provides that:

> (f) Prosecution of the work at a rate that will exhaust the funds available for payment of earnings before the end of the fiscal year will be at the Contractor's sole risk; however, should the Contractor so elect, it may continue the work in accordance with the terms and conditions of the contract: Provided, That funds are available for inspection and supervision, of which the Contracting Officer will so notify the Contractor. No payment will be made for interest resulting from a Contractor's election to proceed with the work after funds have been exhausted.[9]

Paragraph 1.5.7(g) provides that if funds are exhausted and the contractor suspends performance, an extension of time in response to the suspension shall be made, but without a price adjustment. Paragraph 1.5.7(h) provides that, upon exhaustion of funds, if the government is unable to find additional funding within the first 60 days of the new fiscal year, "the Contractor may, if it so elects, terminate this contract by written notice to the Contracting Officer." On the issues of encouraging contractors to work after exhaustion of funds and the acceptance of voluntary services from contractors, in addition to the "Administration of Funds" clause, there is also the "subject to the availability of funds" clause, which warns that the government has no legal liability until (1) funds are made available to the contracting officer and (2) the contracting officer provides notice of availability of funds to the contractor. 48 C.F.R. § 52.232–19 (1990).

Although the language of paragraph 1.5.7(f) may appear to "permit" the contractor to elect to continue work after exhaustion of funds, there are repeated caveats recited in the "Administration of Funds" clause and in the "subject to the availability of funds" clause to the effect that working at a rate that will exhaust funding is at the Contractor's sole risk. The prohibition of 31 U.S.C. § 1342 reads that agency employees "may not accept voluntary services."[10] 31 U.S.C.

---

**8.** Once the contracting officer receives notice from the contractor that it appears funding may be exhausted within the next thirty days, the agency has an opportunity to attempt to secure additional funding to continue the project.

**9.** Compare the language in the "Administration of Funds—Reclamation (November 1984)" clause, paragraph (f) ("should the Contractor so elect, it may continue the work [at a rate that may exhaust the funds available]") with the language in the Bureau's current "Limitation of Funds (Fixed–Price Contract)—Bureau of Reclamation (December 1994)" clause, paragraph (c) ("The Contractor shall not be obligated to continue performance of this work beyond [available funding]"), WBR 1452.232–80, and the language of the Department of Defense's (DOD) "Limitation of Government's Obligation (LOGO clause) (August 1993)" clause, paragraph (b) ("The Contractor will not be obligated to continue work on those item(s) beyond [available funding]."), 48 C.F.R. § 252.232–7007 (1997). The plaintiff compares the November 1984 USBR clause unfavorably with the Defense Department's LOGO clause. The most recent version of the USBR clause and the DOD's LOGO clause are designed for use on fixed-price, incrementally funded contracts. The two clauses do not flatly prohibit a contractor from continuing to work in the absence of funding, nor does the November 1984 USBR clause's language, "should the Contractor so elect," impose an obligation on the part of the contractor to continue working.

**10.** Citing *Sutton v. United States*, 256 U.S. 575, 41 S.Ct. 563, 65 L.Ed. 1099 (1921), the plaintiff argues that: "[n]aturally, since the government is prohibited from accepting voluntary services, it is also prohibited from contracting for, requesting or encouraging a contractor to perform services in anticipation of future appropriations." *Sutton*, which is distinguishable from the case at bar, involved a dredging and excavation contract with the War Department, wherein work was actually performed in excess of the appropriation available. The contractor filed a claim for the work performed beyond the exhaustion of the appropriation, which was denied by the United States Supreme Court inasmuch as the agency had no authority to obligate the government beyond the appropriation or to accept voluntary services. *Id.* at 577–81, 41 S.Ct. 563. The case involves a violation of earlier versions of fiscal control statutes, stemming from a contractor relying on faulty government estimates of work completed and thereby completing work

§ 1342. However, no voluntary services were accepted under the contract at issue. There was no exhaustion of funds and the plaintiff was not put into a position of having to work beyond available funding. In fact, the plaintiff, PCL, did not continue to work in the absence of appropriations.

The plaintiff argues, however, that there was an exhaustion of funds, in that the agency's obligations exceeded the funds available at certain times during contract performance. Plaintiff asserts that the government's figures reflect approximately $34 million obligated to the contract on May 1, 1994, with, at that point in time, $29 million in progress payments earned by the contractor, another $1.5 million estimated for resolution of changes, $5 million estimated for resolution of a request for equitable adjustment, and another $4 million estimated for termination costs. Therefore, according to the plaintiff, the total of progress payments earned on May 1, 1994 plus estimated liability was $39.5 million, or $5.5 million more than had been obligated to the contract at that point in time. However, the amounts for the changes to the contract and the plaintiff's request for equitable adjustment were projections and not obligations on May 1, 1994. As an example, the first amended complaint reflects that plaintiff is seeking $31,040,071.00 plus Contract Disputes Act interest. At the time of the amended complaint, the merits of the claimed amount had not yet been fully resolved and there was no present governmental obligation for that amount of funding. Thus, there was no Antideficiency Act violation for failure to fully fund this amount. Under plaintiffs reasoning, an agency would have to obtain from Congress appropriations to cover unanticipated claims, even claims ultimately determined to be without merit, to avoid an Antideficiency Act violation. Under plaintiffs reasoning, which this court rejects, fixed-price contracts such as plaintiffs contract would not only have to be fully funded, but somehow funded to cover unanticipated and even unjustified contractor claims.

Plaintiff next argues that defendant did not always have funding sufficient to cover

beyond the appropriation available. The United States Supreme Court would not permit recovery

claims which had been settled, and that "contract modification increased the price and scope of work of the Contract without increasing the contract funding." In this regard, plaintiff cites a USBR response to an August 16, 1994 letter from PCL's construction manager inquiring about funding. The USBR letter states:

> You [PCL's construction manager] stated that you assumed that funding is currently at $36,551,000. The current contract *value* as of September 6, 1994 is $36,051,832.58. The value includes the original award amount of $33,854,000 plus all definitized modifications. Modifications Nos. 097 through 101 have been transmitted to your office for execution and upon return and execution by the Contracting Officer will raise the contract value to $36,534,713.58.

> The Reclamation Act allows Reclamation to incrementally fund contracts, such as yours. A directed modification is accompanied by an "Availability of Funds" statement from our Finance and Budget Office that states funds in that specific amount are available for the work. When you reach the limit of funding and are ready to invoice the current work, additional funds are reserved under the contract from the funds previously made "available". Interest begins to accrue when funds are reserved. In order to save the power and water users as much interest expense as possible, funds are reserved only as needed.

> We cannot apply funds for modifications to the contract until the modifications are signed by both parties. You have requested $41,000,000 be reserved on the contract. This dollar amount reflects estimates for some change orders which have not been negotiated, change orders you have not submitted proposals on, and possible change orders for which there is no merit.

> I hope this letter explains Reclamation's method of providing for funds under the contract. Funding is available for invoicing purposes for the base contract. For directed work, the funds are available and

by the contractor for work performed and costs incurred beyond the funds available. *Id.*

will be applied to the contact [sic] when the modifications are definitized.

Modifications adding within scope work to a base contract typically involve proposals, negotiation, definitization, and execution. Once the added work becomes part of the contract, the same principles of incremental funding approved by this court for the base contract apply to the added work. Subsequent within scope changes to a contract may not be foreseen, and are not required to be fully funded at the inception of the contract.

 Plaintiff also argues that the contract in question lacks mutuality, citing the FAR definition of a "contract," as the definition of a mutually binding legal relationship. 48 C.F.R. § 2.101 (1990). Plaintiff elaborates as follows:

> The Administration of Funds clause, by imposing upon PCL the non-mutual, one-sided obligation either to continue work at its own risk or else incur unreimbursable delay costs, while the USBR's obligations are contingent upon future funding, is not "mutually binding" and therefore runs contrary to the FAR definition of a contract. Therefore, due to its own non-mutual terms, PCL's Contract was not a contract at all according to the requirements of the law. The Court should therefore reform the Contract to a cost-type contract where both parties' obligations are mutual, or else allow PCL to recover in *quantum meruit* under a mutual, implied-in-fact contract.

When plaintiff speaks of a "one-sided obligation," PCL appears to be raising the issue of the adequacy of consideration. It is a long-established rule that the court will inquire only into whether there has been a bargained-for exchange, and not into the adequacy of consideration. *See Silverman v. United States*, 230 Ct.Cl. 701, 711, 679 F.2d 865, 871 (1982); *Mills v. United States*, 187 Ct.Cl. 696, 700–01, 410 F.2d 1255,1258 (1969); *Florida Keys Aqueduct Auth. v. United States*, 7 Cl.Ct. 297, 299 (1985), *aff'd*, 790 F.2d 95 (Fed.Cir.1986). Even if plaintiff now believes that the bargain PCL originally made is undesirable, and that preferable contractual arrangements would have included a cost-reimbursement form of contract, based

on the record, the contract entered into represented a mutually binding relationship between the parties.

In addition to defendant's cross-motion for summary judgment on Count X, the government also filed a motion to dismiss both Counts IX and X for failure to set forth claims upon which relief can be granted. When considering a motion to dismiss, the court may consider all relevant evidence in order to resolve any disputes as to the truth of the jurisdictional facts alleged in the complaint. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). The court is required to decide any disputed facts which are relevant to the issue of jurisdiction. *Id.*

The standard for weighing the evidence presented by the parties when evaluating a motion to dismiss for lack of jurisdiction, pursuant to RCFC 12(b)(1), and/or a motion to dismiss for failure to state a claim upon which relief can be granted, pursuant to RCFC 12(b)(4), as in the instant case, has been articulated by the United States Supreme Court, as follows: "in passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *accord Hamlet v. United States*, 873 F.2d 1414, 1416 (Fed.Cir.1989); *see also Alaska v. United States*, 32 Fed.Cl. 689, 695 (1995), *appeal dismissed*, 86 F.3d 1178 (Fed.Cir.1996). In rendering a decision, the court must presume that the undisputed factual allegations included in the complaint by a plaintiff are true. *Miree v. DeKalb County*, 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d at 746; *Alaska v. United States*, 32 Fed.Cl. at 695.

The burden of establishing jurisdiction is on the plaintiff. *McNutt v. General Motors Acceptance Corp. of Indiana*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936); *Alaska v. United States*, 32 Fed.Cl. at 695; *Catellus Dev. Corp. v. United States*, 31 Fed.Cl. 399, 404 (1994). The court should not grant

a motion to dismiss "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (footnote omitted). Nonetheless, "conclusory allegations unsupported by any factual assertions will not withstand a motion to dismiss." *Briscoe v. LaHue*, 663 F.2d 713, 723 (7th Cir.1981), *aff'd*, 460 U.S. 325, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983).

■ In order for this court to have jurisdiction over plaintiff's complaint, the Tucker Act, 28 U.S.C. § 1491 (1994), as amended 28 U.S.C.A. § 1491 (Supp.1998), requires that a substantive right, which is enforceable against the United States for money damages, must exist independent of 28 U.S.C. § 1491. The Tucker Act provides:

> The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.

28 U.S.C. § 1491(a)(1). The Tucker Act merely confers jurisdiction on the United States Court of Federal Claims; it does not create a substantive right that is enforceable against the United States for money damages. *United States v. Mitchell*, 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607, *reh'g denied*, 446 U.S. 992, 100 S.Ct. 2979, 64 L.Ed.2d 849 (1980) (*Mitchell I*); *United States v. Testan*, 424 U.S. 392, 398–99, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976); *United States v. Connolly*, 716 F.2d 882, 885 (Fed.Cir.1983) (*en banc*), *cert. denied*, 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984).

■ Moreover, a waiver of the traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (citing *United States v. Sherwood*, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). The individual claimants, therefore, must look beyond the jurisdictional statute for a waiver of sovereign immunity. *United States v. Testan*, 424 U.S. at 398, 96 S.Ct. 948. "[I]n order for a claim against the United States founded on statute or regulation to be successful, the provisions relied upon must contain language which could fairly be interpreted as mandating recovery of compensation from the government." *Cummings v. United States*, 17 Cl.Ct. 475, 479 (1989), *aff'd*, 904 F.2d 45 (Fed.Cir.1990) (citations omitted); *see also United States v. Mitchell*, 463 U.S. 206, 216–17, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*) (citing *United States v. Testan*, 424 U.S. at 400, 96 S.Ct. 948 (quoting *Eastport Steamship Corp. v. United States*, 178 Ct.Cl. 599, 607, 372 F.2d 1002, 1009 (1967))); *Duncan v. United States*, 229 Ct.Cl. 120, 138, 667 F.2d 36, 47 (1981), *cert. denied*, 463 U.S. 1228, 103 S.Ct. 3569, 77 L.Ed.2d 1410 (1983).

According to RCFC 12(b)(4), "[a] motion to dismiss for failure to state a claim upon which relief can be granted is appropriate where the plaintiff cannot assert a set of facts which would support its claim." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 215 (Fed.Cir.1993), *cert. denied*, 511 U.S. 1106, 114 S.Ct. 2100, 128 L.Ed.2d 662 (1994) (citing *Chang v. United States*, 859 F.2d 893, 894 (Fed.Cir.1988)). In determining a motion to dismiss under RCFC 12(b)(4), the court "must 'assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant.'" *Id.* (citing *Gould v. United States*, 935 F.2d 1271, 1274 (Fed.Cir.1991)). RCFC 12(b)(4) "mirrors" Rule 12(b)(6) of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 12(b)(6); *Maniere v. United States*, 31 Fed.Cl. 410, 419 (1994). The court is required to deny a motion pursuant to RCFC 12(b)(4) or Rule 12(b)(6), "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. at 45–46, 78 S.Ct. 99 (footnote omitted); *see also Maniere v. United States*, 31 Fed.Cl. at 419 (citing *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed.Cir.1993)).

Defendant's motion to dismiss both Counts IX and X of the complaint, for failure to set forth claims upon which relief can be grant-

ed, was based on the opinion issued by the United States Court of Appeals for the Federal Circuit in *American Telephone and Telegraph Co. v. United States* (*AT & T*), 124 F.3d 1471 (Fed.Cir.1997). Defendant's motion to dismiss, however, was submitted before the judgment in the *AT & T* case was vacated and the accompanying opinion withdrawn. As noted above, the United States Court of Appeals for the Federal Circuit has agreed to hold a rehearing in the case *en banc*. *AT & T*, 136 F.3d 793 (Fed.Cir.1998). Also, as discussed earlier, Count X alleges that the contract between the parties was illegal due to violation of the Antideficiency Act and other fiscal control statutes. Although the *AT & T* case concentrated on section 8118 of the Department of Defense Appropriations Act, Pub.L. No. 100–202 § 8118, 101 Stat. 1329, 1329–84 (1987), the Antideficiency Act was briefly addressed in the *AT & T* case, as follows:

> The Court of Federal Claims concluded that § 8118's requirement for a written determination upholding the pricing integrity of a fixed-price development contract operates as a constraint on the contracting process intended for the protection of both Government and contractor. We agree with the Court of Federal Claims on this point, and affirm its conclusion. The congressional purpose is abundantly clear: "None of the funds provided ... may be obligated or expended for [certain] fixed-price contracts." *The attempt by the Navy to obligate or expend funds for a contract not properly authorized by Congress is ineffective to either commit or make use of federal dollars. The Government's attempt to contract fails. No valid contract was or could be entered into in face of the express congressional prohibition. See, e.g., 31 U.S.C. § 1341 (1994) ("Limitations on expending and obligating amounts" (the "Antideficiency Act").).*

*Id.* at 1478–79 (citations omitted) (emphasis added). In the highlighted language of the now withdrawn opinion, the *AT & T* court suggested that a violation of the Antideficiency Act could raise the fundamental issue of the existence of the authority to form a contract. *Id.* at 1479–80. In the case at bar, however, evaluation of the cross-motions have led the court to the conclusion that the Antideficiency Act and the other fiscal control statutes cited by plaintiff were not violated. Thus, even if the reasoning of the original Federal Circuit opinion in the *AT & T* case was to be re-endorsed, it would not affect the PCL contract, since the initial premise, that a violation of the Antideficiency Act occurred in the incremental funding for the construction of the Hoover Dam Visitor Center and Parking Structure, is absent in the case at bar. Based upon the court's decision to sustain the defendant's cross-motion for summary judgment, the defendant's subsequently filed motion to dismiss Count X is mooted. Moreover, as noted above, the underlying basis for the defendant's motion, the *AT & T* decision, was vacated after the defendant's motion was filed, for which reason defendant's motion to dismiss Count X must also fail.

 Defendant also filed a motion to dismiss Count IX of plaintiff's complaint. In Count IX, the plaintiff alleges that the underlying construction contract was illegal in that the government violated provisions of the FAR which address the type of contract to be used in a procurement. The plaintiff contends that the degree of risk and uncertainty in this procurement should have led to the award of a cost-reimbursement contract to PCL, rather than a firm-fixed-price type of contract.

The portion of the FAR relied on by the plaintiff ("Part 16—Types of Contracts") indicates that the FAR provides "guidance" for selection by the contracting officer, in his or her discretion, on the appropriate form of contract. 48 C.F.R. § 16.000 (1990). In addition, FAR Part 36, which was not noted by the plaintiff, specifically addresses construction contracts, and provides that firm-fixed-price contracts generally shall be used for construction contracts. 48 C.F.R. § 36.207(a) (1990). Moreover, with regard to the award of a firm-fixed-price contract for the "Boulder Canyon Project," plaintiff failed to raise its objections prior to award of the contract, despite an opportunity to do so. Any objection to the choice of contract type should have been raised prior to submission

of bids, and, certainly, prior to contract completion.

Although it appears that the plaintiffs allegation of a violation of the FAR may be unsupportable,[11] even if use of a firm-fixed-price type of contract were found to be a violation of the FAR, and even if the original United States Court of Appeals for the Federal Circuit *AT & T* opinion were to be reinstated, the plaintiff has alleged circumstances by which a contract appears to have come into existence (i.e., was not rendered a nullity) and this court has jurisdiction to review plaintiff's claim. A distinction has been recognized in the Federal Circuit between the violation of statutes and regulations which impact the authority to enter into a contract and, thereby, render the contract a nullity, and violations which do not. For example, as stated by the United States Court of Appeals for the Federal Circuit:

> where a problem of the validity of the invitation or the responsiveness of the accepted bid arises after the award, the court should ordinarily impose the binding stamp of nullity only when the illegality is plain. If the contracting officer has viewed the award as lawful, and it is reasonable to take that position under the legislation and regulations, the court should normally follow suit.... It is therefore just to the contractor, as well as to the Government, to give him the benefit of reasonable doubts and to uphold the award unless its invalidity is clear.

*United States v. Amdahl Corp.*, 786 F.2d 387, 394 (Fed.Cir.1986) (quoting *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl.1963), *cert. denied*, 377 U.S. 931, 84 S.Ct. 1332, 12 L.Ed.2d 295 (1964) (footnote omitted) (citations omitted)). In a fact situation in which the plaintiff appears to be alleging that FAR "guidance" on the selection of contract type was violated, but in which the FAR itself provides that firm-fixed-price contracts, the type of contract used in this case, generally shall be used in construction contracts, and in which there are no specific FAR instructions specifying the type of con-

tract to be used, the alleged FAR violation is not the type in which the illegality is so plain as to "impose the binding stamp of nullity." *John Reiner & Co. v. United States,* 325 F.2d at 440.

Although addressing Pub.L. No. 100–202, § 8118, 101 Stat. 1329–84 (1987), which is not at issue in the above-captioned case, Judge Newman's distinction between the types of violations of statutes and regulations in her dissent in the now vacated *AT & T* opinion is instructive:

> Not every violation of a statute or regulation ... renders a contract void or invalid-particularly after it has been fully performed.... Indeed, contracts between the government and a private party have been sustained even when statutes and regulations relating to the procurement or award process have been violated. *E. Walters & Co. [v. United States,* 217 Ct.Cl. 254,] 576 F.2d 362, 367 [(1978)] ("the fact that a procurement practice is prohibited does not necessarily mean that it is therefore actionable"); *see Walsh v. Schlecht,* 429 U.S. 401, 408, 97 S.Ct. 679, 685, 50 L.Ed.2d 641 (1977) (requiring preservation of the validity of contracts that are not plainly illegal); *United States v. New York & Porto Rico S.S. Co.,* 239 U.S. 88, 92, 36 S.Ct. 41, 42, 60 L.Ed. 161 (1915) (when government did not comply with formal requirements, contract not illegal and recovery permitted upon quantum valebat when performed) (citing *United States v. R.P. Andrews & Co.,* 207 U.S. 229, 243, 28 S.Ct. 100, 105, 52 L.Ed. 185 (1907); *Trilon Educational Corp. v. United States,* 217 Ct.Cl. 266, 578 F.2d 1356, 1361 (1978)) (the fact that the contracting officer may have disregarded a directive of the ASPR does not ordinarily render the contract a nullity); *Ocean Technology, Inc. v. United States,* 19 Cl.Ct. 288, 294 (1990) ("Performance having been fully completed, holding the obligation to pay unenforceable is not a position favored in this circuit.").

> In contrast, those contracts that have been held void or invalid on the ground of

11. The court notes that whether a violation of the FAR occurred based on the selection of the con-

tract type was minimally briefed by the parties.

a statutory or regulatory violation have been clearly illegal in a material aspect, in that they violated provisions explicitly limiting the authority of a party to enter into the contract, or expressly prohibiting the contract altogether. *E.g., Clark v. United States*, 95 U.S. 539, 542, 24 L.Ed. 518 (1877) (unlawful for contracting officers to make contracts that violate the statute of frauds); *Urban Data Systems, Inc. v. United States*, 699 F.2d 1147, 1150 (Fed. Cir.1983) (recovery based on implied-infact contract after contracts declared invalid because they contained pricing clauses in plain violation of statute); *Alabama Rural Fire Ins. Co. v. United States*, 215 Ct.Cl. 442, 572 F.2d 727, 729, 736 (1978) (the statute creating the plaintiff corporation expressly forbade plaintiff from entering contract).

*AT & T*, 124 F.3d at 1480–81 (Newman, J., dissenting) (opinion withdrawn).[12]

In the instant case, the nature of the alleged violation of the FAR does not appear to fall into the category which should render the contract a nullity. Moreover, the underlying basis for defendant's motion to dismiss, the *AT & T* opinion, was vacated subsequent to the submission of the defendant's motion. Therefore, defendant's motion to dismiss Count IX is denied.

## CONCLUSION

For the foregoing reasons, defendant's cross-motion for summary judgment on Count X is **GRANTED** and plaintiffs motion for partial summary judgment is **DENIED**. Defendant's subsequently filed motion to dismiss Count X is thereby mooted. Defendant's motion to dismiss Count IX, which was opposed by plaintiff, is **DENIED**.

**IT IS SO ORDERED.**

---

12. *See generally Gould, Inc. v. United States*, 67 F.3d 925, 929–30 (Fed.Cir.1995) (despite an allegation of illegality of the contract at issue, the court found jurisdiction in the United States Court of Federal Claims because the plaintiff's complaint alleged the existence of an express contract, the illegality was not plain on its face, and the complaint also alleged an implied-in-fact contract as a separate basis of jurisdiction); *Cessna Aircraft Co. v. Dalton*, 126 F.3d 1442, 1448 (Fed.Cir.1997) (violation of the Antideficiency Act was alleged, but the court found no violation of that Act and found a cognizable claim for relief in plaintiff's allegation of an implied-in-fact contract).