**PCL CONSTRUCTION SERVICES, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5060.

United States Court of Appeals, Federal Circuit.

DECIDED: April 7, 2004.

Herbert L. Fenster, Principal Attorney, Joanna C. Kitto, of Counsel, McKenna, Long, Denver, CO, for Plaintiff–Appellant.

Thomas J. Kelleher, Jr., Principal Attorney, Atlanta, GA, Amicus Curiae.

Brian S. Smith, Principal Attorney, David M. Cohen, Deborah A. Bynum, of Counsel, Department of Justice, Washington, DC, for Defendant–Appellee.

Before RADER, LINN, and DYK, Circuit Judges.

DYK, Circuit Judge.

Appellant PCL Construction Services, Inc. ("PCL") alleges that, by providing defective construction drawings, the United States Bureau of Reclamation ("USBR") breached PCL's contract to build a parking structure and a visitor's center at the site of the Hoover Dam. After trial, the Court of Federal Claims rejected PCL's claim for breach of contract damages. *PCL Constr. Servs., Inc. v. United States*, 47 Fed.Cl. 745 (2000) ("*PCL II*"). PCL further argues that the contract was illegally funded and that it can recover on a theory of *quantum meruit*. The Court of Federal Claims also rejected this theory, on summary judgment. *PCL Constr. Servs., Inc. v. United States*, 41 Fed.Cl. 242 (1998) ("*PCL I*"). We affirm.

## BACKGROUND

On September 5, 1991, the USBR awarded a contract to PCL for the construction of a visitor center and parking structure at the site of the Hoover Dam. The contract was a firm fixed-price contract with a price of $33,854,000, but it was to be funded through annual Congressional appropriations over the term of the contract. The contract specified, among other things, that the parking structure was to be built in a box canyon located off of the main canyon in which the Hoover Dam stands. During the construction of the Hoover Dam, the box canyon had been partially filled and leveled with boulders, rock fragments, and other debris. As a result, although the contours of the rock fill were known, the specific contours of the underlying canyon surface were unknown.

The USBR had previously entered into a contract under which The Promontory Partnership ("Promontory") designed the visitor center and parking structure. Pursuant to this contract, Promontory had prepared the drawings for the PCL contract. The USBR provided 465 such drawings, among which were several drawings depicting the rock fill contours and estimated location of the underlying canyon surface. The drawings also depicted the locations of column footings, which were designed to support the parking structure and had to be founded upon the "competent rock" of the underlying canyon surface. These drawings proved to be inaccurate, and the design of some of the parking structure supports had to be revised when the actual contours of the surface of the canyon were ascertained after construction began. PCL argues that these inaccuracies were design defects for which the USBR is responsible. Only the alleged design defects in the foundation drawings for a portion of the parking structure are at issue in this appeal.

The contract required PCL to complete construction of the parking structure by February 15, 1994, but the structure was not deemed substantially complete until May 12, 1995, when the USBR began using it and the visitor center. PCL maintained that this delay was caused by the USBR; that the delay disrupted PCL's performance of the contract; and that the additional costs PCL incurred as a result of the delay and disruption were recoverable on a breach of contract theory. PCL filed a breach of contract claim in the amount of $31,040,071 with the contracting

officer on July 25, 1995. The USBR subsequently began withholding funds from PCL, stating that "withholding of funds is necessary for the protection of the Government's interest in accrued liquidated damages, outstanding required submittals, and credits due the Government for changes and/or reductions in work." *PCL II*, 47 Fed.Cl. at 781. The contracting officer denied PCL's breach of contract claim on September 21, 1995. PCL stopped performing work related to the contract on November 22, 1995, and the USBR assessed liquidated damages and terminated the contract for default on March 6, 1996.

On October 4, 1995, before the default termination, PCL filed a complaint against the USBR in the Court of Federal Claims, alleging breach of contract and asserting also that it was entitled to recover on a theory of *quantum meruit* because the contract had been illegally funded in violation of the Anti–Deficiency Act, 31 U.S.C. §§ 1341–42 (2000).[1] PCL filed a second complaint on July 23, 1996, after the termination, alleging that the USBR had terminated the contract and assessed liquidated damages improperly. The Court of Federal Claims consolidated the two cases and, on June 26, 1998, granted summary judgment in favor of the USBR on PCL's claim that the incremental funding of the

contract was illegal, holding that 43 U.S.C. § 388 authorized such funding for the project.[2] *PCL I*, 41 Fed.Cl. at 257.

The issues of liability and quantum as to PCL's remaining claims were bifurcated for trial, and, after a fifty-one day trial, the Court of Federal Claims held that (1) the USBR had not breached the contract and (2) it had properly terminated the contract for default, *id.* at 812. On August 28, 2002, the court held that the USBR was not entitled to liquidated damages and that PCL was entitled to the funds that the USBR had retained. *PCL Constr. Servs., Inc. v. United States*, 53 Fed.Cl. 479, 493 (2002) ("*PCL III*"). The court entered judgment in both of the consolidated cases on December 30, 2002. PCL timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).[3]

## DISCUSSION

We review legal decisions by the Court of Federal Claims without deference, and we review the court's factual findings for clear error. *Ferreiro v. United States*, 350 F.3d 1318, 1324 (Fed.Cir.2003).

### I

### A

The appellant contends that, by providing site and foundation drawings that in-

---

**1.** The Anti–Deficiency Act provides, in pertinent part, that "[a]n officer or employee of the United States Government ... may not ... involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law," 31 U.S.C. § 1341(a)(1)(B), and that "[a]n officer or employee of the United States Government ... may not accept voluntary services for [the] government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property," *id.* § 1342.

**2.** Section 388 provides:

When appropriations have been made for the commencement or continuation of construction or operation and maintenance of any project, the Secretary may, in connection with such construction or operation and maintenance, enter into contracts for miscellaneous services, for materials and supplies, as well as for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor.

43 U.S.C. § 388 (2000).

**3.** The USBR did not appeal from the decision on liquidated damages.

cluded substantial errors, the USBR breached its obligation under the contract to provide accurate drawings. However, the Court of Federal Claims noted that the contract included provisions notifying PCL that the drawings might include errors. Section 01030, paragraph 1.02(B) of the contract provided:

> The drawings and specifications are based upon such data which could reasonably be secured and contain design information which is customarily provided for the construction process. Extreme accuracy is not guaranteed, nor is perfection in these documents implied.... Contractor shall expect that there may be some omissions, discrepancies, and conflicts within the design documents and with the actual field and construction conditions encountered. The contract therefore requires significant supervision and engineering efforts by the constructors in order to help resolve such issues when they arise.

(J.A. at A3694.) The court further noted that the contract stated that the "[d]ata and information shown and indicated [on maps and drawings of existing topography] are as accurate as could be obtained but are not guaranteed." *PCL II*, 47 Fed.Cl. at 790 (quoting J.A. at A3703). Though agreeing that some amount of error was to be expected, the appellant contended that the number of errors exceeded industry standards and introduced evidence that the number of revisions to the USBR's drawings exceeded the number that would ordinarily occur in the construction industry.

The Court of Federal Claims rejected PCL's claim on the ground that the contract specifications were primarily performance specifications and that the

USBR therefore had no obligation to provide usable drawings. *PCL II*, 47 Fed.Cl. at 796 ("It is evident to the court that the portions of PCL's contract at issue were performance specifications, or a mix of design and performance specifications, but not exclusively design specifications, which carry with them an actionable implied warranty."). This reasoning appears to us to be at least questionable, but we need not reach this issue because we conclude that, even if the USBR breached its obligation, the appellant failed to establish that this breach caused it injury.[4]

### B

■ Although the Court of Federal Claims bifurcated proceedings between liability and quantum, the issue of causation was tried as part of the liability phase. The appellant agrees that the USBR provided corrected drawings at its expense. The question is whether the failure to produce accurate drawings in a timely manner caused disruption or delay for which the USBR was responsible. The appellant presented its claim as a modified total cost claim; that is, it claimed that the USBR was responsible for nearly all of the extra costs that PCL incurred on the project over the fixed price of $33,854,000 set by the contract. Specifically, PCL sought $32,445,853 in damages for the additional costs it incurred above the $36,564,417 the USBR has already paid PCL under the contract. The appellant excluded $1,166,000 of its costs from its claim because of its own bid errors and for various costs it deemed non-compensable, such as "Parties, Flowers, Donuts & Coffee" and "Site Flat Work," but none of these costs related to any alleged delay. (J.A. at A1088.) In effect, the appellant sought to

---

4. Also questionable was the Court of Federal Claims' conclusion that the defects should have been apparent to PCL, *PCL II*, 47 Fed. Cl. at 794, as the parties stipulated that "[t]here were no patent defects," *id.* at 756 (alteration in original).

hold the government responsible for the entire cost of the delay. After trial, the Court of Federal Claims found that "the government presented ample evidence of PCL's own errors and delays to demonstrate the error in PCL's argument that all of its performance problems were attributable to the government, and to demonstrate the fact that PCL committed a number of errors on the job that impacted its work." *PCL II,* 47 Fed.Cl. at 802. The Court of Federal Claims also found that the appellant had failed to "show a cause and effect relationship between USBR's contract changes and PCL's increased costs," particularly in light of the USBR's evidence of problems caused by PCL. *Id.* at 800. These findings are not clearly erroneous.

At trial, PCL merely offered broad assertions from its experts that the USBR was responsible for the delay and PCL's additional costs, and neither PCL nor its experts ever allocated the responsibility for the delay between the USBR and PCL. For example, PCL's expert Joseph C. Kellogg ("Kellogg") opined that "as a direct result of ... USBR actions, PCL was unable to construct the Project as originally planned and ultimately experienced a delay to the Project's completion of approximately 22 months and cost overruns of $32 million." (J.A. at A862.) Furthermore, Kellogg stated, "PCL field cost overruns and subcontractor claims, which constitute the bulk of the requested claim value, are compensable and a direct consequence of the USBR's breach of the contract." (J.A. at A863.)

"It is incumbent upon the plaintiffs to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on defendant's part." *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 969 (1965).

Although PCL provided evidence of delay by the USBR in providing revised drawings, PCL provided no evidence that this delay caused the increased costs it claimed. In contrast, the USBR, while conceding that it was responsible for some of the project's delay, allocated the responsibility for the total project delay between the USBR and PCL and presented evidence to that effect. The Court of Federal Claims expressly rejected PCL's claim, stating that "PCL ... did not show a cause and effect relationship between USBR's contract changes and PCL's increased costs." *PCL II,* 47 Fed.Cl. at 800. The court credited the USBR's analysis, and it found that the appellant did not conduct a critical path analysis or otherwise establish that the USBR was responsible for any quantified amount of delay attributable to specific errors in the drawings. *Id.* at 800–01. The court did not err in concluding that PCL had not satisfied its burden of proof on the issue of causation. The court also found that the appellant had not asserted a separate disruption claim, *see id.* at 800, and the appellant does not contend otherwise on this appeal.

Finally, the appellant complains that the Court of Federal Claims "simply *ignored* PCL's experts without explanation" because the court did not specifically address their testimony. (Br. for Pl.-Appellant at 37.) However, the Court of Federal Claims is not required to discuss the testimony of each of the appellant's experts specifically: "The fact that the district court did not in its opinion recite every piece of evidence does not mean that the evidence was not considered." *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.,* 315 F.3d 1335, 1343 (Fed.Cir.2003). Here, as in *Plant Genetic Systems,* the Court of Federal Claims "did not commit legal error for not reciting [the evidence supplied by the appellant]. Neither did it clearly err in finding that certain pieces of evi-

dence had more weight than others or were more worth discussing." *Id.*

## II

PCL also argues that the USBR breached the contract by making changes to the contract that constituted a "cardinal change." However, as the Court of Federal Claims noted, "[i]t is well-settled that a cardinal change 'occurs when the government effects an alteration in the work so drastic that it effectively requires the contractor to perform duties materially different from those originally bargained for.'" *PCL II*, 47 Fed. Cl. at 804 (quoting *AT & T Communications, Inc. v. WilTel, Inc.*, 1 F.3d 1201, 1205 (Fed.Cir.1993)). "The finding of a cardinal change is 'principally a question of fact.'" *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir.2003) (quoting *Allied Materials & Equip. Co. v. United States*, 215 Ct.Cl. 406, 569 F.2d 562, 565 (1978)). Here, the Court of Federal Claims found that "PCL had not demonstrated that the contract changes ... amounted to a cardinal change." *PCL II*, 47 Fed.Cl. at 806. The court relied in part on concessions by a PCL employee and one of PCL's experts, and it found that "PCL cannot make a showing that changes in its 'duties' occurred, or that PCL's duties changed so much that a cardinal change occurred." *Id.* at 805. These findings are not clearly erroneous.

## III

Finally, the appellant contends that the USBR violated the Anti–Deficiency Act because the contract was not fully funded on the date of the award and at several points during the performance of the contract. The Anti–Deficiency Act provides that "[a]n officer or employee of the United States Government ... may not ... involve [the] government in a contract or obligation for the payment of money before an appropriation is made unless authorized by law." 31 U.S.C. § 1341(a)(1)(B). The appellant argues that, because the contract obligated the USBR to pay the fixed sum of $33,854,000 before Congress appropriated all of such funds, it violated this statute. Alternatively, the appellant argues that, to the extent it was required to perform work before Congress appropriated sufficient funds to pay for the work performed, the USBR violated 31 U.S.C. § 1342, which provides that "[a]n officer or employee of the United States Government ... may not accept voluntary services for [the] government or employ personal services exceeding that authorized by law except for emergencies involving the safety of human life or the protection of property."

The Court of Federal Claims held that 43 U.S.C. § 388 authorized the contract's incremental funding because the construction of the parking structure was part of the larger Boulder Canyon Project, which was created in 1928 primarily for the purpose of constructing the Hoover Dam. *See PCL I*, 41 Fed.Cl. at 256. Section 388 provides:

> When appropriations have been made for the commencement or continuation of construction or operation and maintenance of any project, *the Secretary may*, in connection with such construction or operation and maintenance, *enter into contracts* for miscellaneous services, for materials and supplies, as well as *for construction, which may cover such periods of time as the Secretary may consider necessary but in which the liability of the United States shall be contingent upon appropriations being made therefor.*

43 U.S.C. § 388 (emphases added). The contract provided that the government's liability was contingent upon the availabili-

ty of funds, which the contracting officer was required to confirm in writing. Such a provision is not unlawful.

The Court of Federal Claims found that "[t]he visitor center and parking structure construction obviously is linked to and one of the construction components of the Boulder Canyon Project." *PCL I*, 41 Fed.Cl. at 256. The court noted that the statute providing for and funding the project "further amended" the Boulder Canyon Project Act of 1928, Pub. L. No. 70-642, 45 Stat. 1057, and provided that that Act "shall remain in full force and effect." *PCL I*, 41 Fed. Cl. at 256 (quoting Hoover Power Plant Act of 1984, § 103, Pub. L. No. 98-381, 98 Stat. 1333, 1334). Thus, the court held, PCL's "construction contract was 'in connection with' the Boulder Canyon Project, and thus may be incrementally funded under the authority of 43 U.S.C. § 388." *Id.* Furthermore, the court found that "[t]here was no exhaustion of funds and [PCL] was not put into a position of having to work beyond available funding." *PCL I*, 41 Fed.Cl. at 259. These findings are not clearly erroneous.

In any event, the appellant has directed us to no authority that such a violation, if there were one, would allow the contractor to maintain suit for recovery on a theory of *quantum meruit.*

We have considered the appellant's other arguments, and we find them to be without merit.

### CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Federal Claims.

### COSTS

No costs.