ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeals of -- | ) | |
| | ) | |
| Harry Pepper and Associates, Inc. | ) | ASBCA Nos. 62038, 62039, 62040 |
| | ) | 62041, 62042 |
| Under Contract No.  NNS14AA30T | ) | |

APPEARANCES FOR THE APPELLANT:          David W. Mockbee, Esq.
                                        D. Wesley Mockbee, Esq.
                                          Mockbee Hall & Drake, P.A.
                                          Jackson, MS

APPEARANCES FOR THE GOVERNMENT:         Scott W. Barber, Esq.
                                          NASA Chief Trial Attorney
                                        Jeffrey A. Renshaw, Esq.
                                        Shannon A. Sharkey, Esq.
                                          Trial Attorneys
                                          Stennis Space Center, MS

OPINION BY ADMINISTRATIVE JUDGE THRASHER ON THE
GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND
MOTION TO DISMISS FOR LACK OF JURISDICTION

The National Aeronautics and Space Administration (NASA or government) filed a motion for summary judgment on Harry Pepper & Associates' (HPA's or appellant's) sixth claim for relief, which is based on the theory of a cardinal change. Though NASA styles its motion as one for summary judgment, it is aimed at one of the several theories behind each of the appeals, and would not result in disposal of any of the appeals at issue even if successful.  Thus, the Board considers it to be a motion for partial summary judgment.  We find NASA has shown that appellant has not alleged facts sufficient to constitute a cardinal change, and appellant fails to either show material facts in dispute or meaningfully rebut NASA's argument.

In the alternative, NASA argues that we lack jurisdiction because this claim was not submitted to the contracting officer (CO) with a sum certain.  But the Board's review of HPA's claims demonstrates otherwise.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTIONS

We previously issued a decision resolving the parties' cross motions for summary judgment related to Counts I-V of appellant's complaint.  Familiarity with

that decision and the facts discussed therein is presumed.  However, we will reiterate several relevant facts here for clarity.

1. NASA awarded Contract No. NNS12AA84B, a multiple award construction contract to HPA on August 3, 2012.  This contract included the following relevant clauses:  FEDERAL ACQUISTION ACT (FAR) 52.233-1, DISPUTES (JUL 2002); FAR 52.236-2, DIFFERING SITE CONDITIONS (APR 1984); and FAR 52.243-4, CHANGES (JUN 2007).  (R4, tab 1 at 16, 38-39)  On January 9, 2014, NASA awarded HPA Task Order NNS14AA30T (TO) for restoration of the B2 Test Stand at the John C. Stennis Space Center, MS, valued at $36,577,459.  This involved relocation of the Main Propulsion Test Article (MPTA) Superstructure, reinforcement of Battleship Point[1], and other tasks (R4, tab 2 at 94-95).  On February 7, 2014, NASA issued HPA a Notice to Proceed, which HPA acknowledged the same day.  This document indicated all work was to be completed by March 14, 2015 (R4, tab 3 at 132).

2. As part of its bid, HPA says it assumed "a maximum of 1/8" of movement" of the structure due to thermal variations during the restoration work (R4, tab 46 at 2325).  HPA also provided a Quality Assurance Plan, which mandated that one HPA representative would be solely responsible for a three-phase inspection approach: "preparatory, initial, and follow-up inspection[s]."  At the initial phase, "[i]f the quality of the work is found to be nonconforming the work will be removed and replaced" and during the follow-up phase, "[n]on-confirming work found during these inspections will be removed and replaced."  (R4, tab 55f at 3425)

3. As part of the reinforcing of Battleship Point Loads "during the MPTA move and afterwards," work which was designated by Engineering Modification Instructions (EMI) 12NCBZ-20 (EMI 20), the TO required installation of 28 wide flange steel shapes cut into two "T" shapes, referred to as "WTs."  Section 01 11 00 of Specification 200HF-G013, paragraph 1.1.3 stated "some of [these] will be installed by lowering them through temporary holes in the battleship top plate."  (R4, tab 18 at 1694)

4. HPA submitted welding procedures specifications to NASA, dated April 29, 2014, which River City Erectors (RCE), a subcontractor, had proposed as part of its work on EMI 20.  These procedures proposed minimum preheat and interpass temperatures for welding various joints based on the thickness of the steel, and are listed as follows:  1/8" – 3/4" is 32º; 3/4" – 1 1/2" is 50º; 1 1/2" – 2 1/2" is 150º; and over 2 1/2" is 225º.  No post weld heat treatment was anticipated.  (R4, tab 56g at 3513, 3518-20)

---

[1] The "Battleship" was not an actual battleship, but was a frame used to support a rocket booster to be tested on the B2 Test Stand.

5. EMI 18, 19, and 20 all contain drawings titled Drawing G-001 which, while different drawings, contain similar General Notes. General Note 2, the same in all three drawings, states "[t]he contractor shall field verify existing conditions, dimensions, and elevations before proceeding with the work. Any discrepancies between the contract documents and the actual field conditions must be reported immediately." General Note 8 states "[t]his design is based on the original drawings, calculations and specifications prepared for the original construction in the 1960s and subsequent field observations by the current design team. . . . Notify the NASA COR [Contracting Officer Representative] if actual conditions differ from the original documents as modified to an 'As-Built' condition in 2011." (R4, tab 4 at 165, tab 5 at 189, tab 6 at 257)

6. HPA submitted Request for Equitable Adjustment (REA) 1 on June 29, 2015, requesting compensation for relocation of the WTs and additional welding and trimming of WTs in the Battleship (app. supp. R4, tab 18 at 477-79). HPA submitted REA 4 on January 11, 2016, requesting compensation for the changes from Request for Information (RFI) 62's revision and 62A's clarification changing Partial Joint Penetration welds to Complete Joint Penetration welds, then to use of a diamond plate. This work was detailed in Field Change Request 37, which HPA stated had been denied. (App. supp. R4, tab 20) HPA supplemented both REAs on July 5, 2017, and a fourth compensation request was added for the cost of bringing the WTs into the Battleship via the north entrance rather than lowering them through a temporary hole in the top plate (app. supp. R4, tab 23c at 634-36).

7. Appellant later resubmitted REAs 1 and 4 as certified claims on December 19, 2018, requesting $2,687,848.40 and a 90-day extension, which NASA subsequently denied (R4, tabs 48, 53). This denial was timely appealed and docketed as ASBCA No. 62038.

8. HPA submitted REA 9, dated July 5, 2017, for changing

> welding procedures on all of the MPTA baseplate
> reinforcement doubler plates . . . to meet the revised
> welding requirements specified by NASA for the first time
> in response to HPA RFI #146A. This extra work was
> necessary due to the excessive size of the fillet weld gaps
> between the existing columns and the new MPTA
> baseplate reinforcement doubler plates.

(App. supp. R4, tab 29b at 1379) This REA requested $852,884.98 (*id.* at 1376).

3

9. HPA submitted REA 10, also dated July 5, 2017, for the

> extensive weld repair work required because of NASA's
> defective design directive on how to bevel and back bevel
> the plates which created voids that had to be reworked
> because of NASA's defective design, and because of
> NASA's failure to detect the two (2) bolts put in the welds
> by a disgruntled [HPA] employee to slug the welds. Per
> NASA's Quality Control responsibility, NASA was
> obligated to have an inspector inspect each weld during the
> entire welding process of each weld.

(App. supp. R4, tab 34c at 1815) This REA requested $3,234,428.58 (*id.* at 1816).

10. HPA submitted a certified claim dated December 19, 2018, reiterating the basis for and incorporating REA 9, and requesting $1,127,909.37 and a 29-day time extension (R4, tab 49 at 3039-40). Another certified claim, dated December 19, 2018, reiterated the basis for and incorporated REA 10, and requested an additional $4,281,841.69 and a 39-day time extension beyond that paid under Mod. 44 (R4, tab 50 at 3053-54). The CO issued two Final Decisions (COFDs), both dated March 27, 2019, denying these claims in their entirety (R4, tabs 54-55). HPA timely appealed both of these denials, and the Board docketed them as ASBCA Nos. 62039 and 62040 respectively.

11. HPA submitted RFI 371, dated April 27, 2016, to NASA, stating that it had "identified an unusually high yield stress of the existing steel structure . . . higher than those identified in the manufactured steel identified in the contract documents." HPA cautioned that if the findings "prove to be accurate that further investigation is warranted . . . and could result in weld failure." NASA's COR responded on May 6, 2016, stating "[t]he additional information and suggestions will be taken into advisement." (App. supp. R4, tab 38)

12. HPA submitted REA 11, dated September 17, 2017, requesting $2,454,368.22 for what it deemed "the extra contractual blanketed pre- and post-heat treatment for full penetration welds for new-to-old . . . [and] new-to-new steel from and after March 9, 2015 because of the NASA directive issued to all welding trades on ongoing projects on the NASA site" (app. supp. R4, tab 40c at 2076). Neither party has pointed to, nor do we see in the Rule 4 file, a NASA directive with this date related to this subject.

13. HPA submitted a certified claim dated December 20, 2018, reiterating the basis for and incorporating REA 11, and requesting $3,258,276.09 and a 69-day extension (R4, tab 51 at 3072-73). The CO issued a COFD dated March 27, 2019,

denying the claim in its entirety (R4, tab 56). HPA timely appealed this denial, which the Board docketed as ASBCA No. 62041.

14. HPA submitted REA 12 on October 18, 2017, alleging "multiple relocation of steel members and extensive additional welding required because of unanticipated thermal movement and vibration of the existing steel structure" (app. supp. R4, tab 43b at 2680). This REA requested $3,128,167.88 (*id.*). Appellant submitted a certified claim dated December 20, 2018, reiterating the basis for and incorporating REA 12, and requesting $4,102,121.47 and a 227-day extension (R4, tab 52 at 3115-16). The CO issued a COFD dated March 27, 2019, denying this claim in its entirety (R4, tab 57). Appellant timely appealed this claim denial, and the Board docketed it as ASBCA No. 62042.

15. REAs 9, 10, 11, 12, and the supplement to REAs 1 and 4 contain identical paragraphs starting and ending with the following sentences:

> In the alternative, QI [Quality Iron, a subcontractor] and RCE suggest that this and the other REA's submitted on the B2 Test Stand Project might most expeditiously and economically be considered by NASA as a cardinal change claim entitling HPA and its subcontractors to recover the reasonable value of the additional and inefficient labor and materials provided to the Project plus reasonable markup for overhead and profit. Clearly, the multiple REA's do cumulatively constitute a cardinal change given that the required out-of-scope work was persuasive [sic.] throughout the project, resulting in increased time to contract completion, different equipment requirements, and increased labor demands. . . The total monetary requests is this and the other submitted REAs are reasonable and necessary labor and material costs plus reasonable markup for overhead and profit.

(App. supp. R4, tab 23c at 870-71, tab 29b at 1393-95, tab 34c at 1852-54, tab 40c at 2099-2101, tab 43b at 2733-34) (syntax in original).

<u>DECISION</u>

In its complaint, appellant alleges a cardinal change as its sixth claim for relief, stating its:

> multiple REAs cumulatively constitute a cardinal change given that the required out-of-scope work was pervasive

throughout the project, resulting in increased time to contract completion, different equipment requirements, and increased labor demands.  Specifically . . . the defects have caused "drastic consequences," constituting a change outside the scope of the contract.

(Compl. ¶ 42)

The government argues all of appellant's claims are redressable under the contract, and the extra work produced essentially the same product as the contract intended, preventing appellant from proving two requirements of a cardinal change. As proof that the contract can redress HPA's claims, NASA points out the REAs (and thus the claims that incorporate them)[2] cite various contract provisions for recovery. NASA further argues this work was performed of appellant's own accord, as NASA does not have privity of contract with HPA's subcontractors, who physically performed the work.  (Gov't mot. at 14, 19)  In the alternative, the government moves for dismissal based on lack of jurisdiction, alleging "[a]ppellant failed to submit a claim in a sum certain, which is required by the CDA" (gov't mot. at 23).

Appellant argues that cardinal change claims are fact specific inquiries, and that the material facts of this case are disputed.  Despite this, it quotes long passages from a treatise on cardinal changes, and presents a "Cardinal Change factors" list compiled from cases from the Nevada Supreme Court and a California Appellate Court (app. opp'n at 1-2).  Appellant also points to its Exhibit 6 as providing evidence of its cardinal change theory (*id.* at 12).

Summary judgment will be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A material fact is one which may make a difference in the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The government must establish the absence of a genuine issue of material fact, after which the burden of proof shifts to appellant to show that there is a genuine factual issue for trial. *Gerald R. Rouillard*, 14-1 BCA ¶ 35,765 at 174,991.

---

[2] Both parties discuss the claims by the REAs upon which they are based (*see, e.g.,* gov't mot. at 19-21; app. opp'n at 6).  As the substance of the parties' arguments relates to the claims in each appeal, and these claims incorporate the REAs referenced, we understand these arguments relate to the claims and denials in those appeals, rather than the REAs which both parties repeatedly cite, and over which we would not have jurisdiction because they, themselves, were not claims for which the contractor sought or the CO issued a final decision.  41 U.S.C. § 7104.

As with its filings under the previous motion, appellant's opposition incorporates its REAs, claims, and exhibits without pointing to any part of these several hundred pages as evidence of its arguments (app. opp'n at 11-12). None of these documents appear to dispute a material fact in relation to the arguments NASA advances. In its opposition, appellant alleges 223 days of delay (app opp'n at 6). Appellant does not indicate it would benefit from any additional discovery in its defense of this motion (app. opp'n at 2). Thus, so much as we are able, this motion will be decided on the record before us. We first address the government's alternative jurisdictional argument, as we generally must satisfy ourselves of jurisdiction whenever it is questioned.

*The Board's Jurisdiction Over The Cardinal Change Theory*

Appellant alleged the theory of cardinal change in REAs 9, 10, 11, 12, and the supplement to REAs 1 and 4, and the claims that grew out of them. In nearly identical openings, appellant stated in each REA, "[i]n the alternative, [appellant] suggest[s] that this and the other REA's submitted on the B2 Test Stand Project might most expeditiously and economically be considered by NASA as a cardinal change claim" indicating its claims should be considered in the aggregate. (SOF ¶ 15) Each claim, incorporating the REAs, requested a sum certain, as required under FAR 2.101's definition of a claim. (SOF ¶¶ 7-10, 13-14) We have held a sum certain is present even if simple arithmetic is required to ascertain it. *M.J. Hughes Constr. Inc.*, ASBCA No. 61782, 19-1 BCA ¶ 37,235 at 181,234. Appellant submitted each claim on December 19 and 20, 2018, roughly in one package (SOF ¶¶ 7, 10, 13-14). The government need merely add the claims at issue to arrive at the sum certain. Accordingly, the Board rejects NASA's contention that we lack jurisdiction to consider the cardinal change theory.

*The Cardinal Change Theory*

The finding of a cardinal change is "principally a question of fact." *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1332 (Fed. Cir. 2003) (quoting *Allied Materials & Equip. Co. v. United States*, 569 F.2d 562, 565 (Ct. Cl. 1978)). "Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting Co. v. United States*, 173 Ct. Cl. 180, 194 (1965) (citing *Saddler v. United States*, 152 Ct. Cl. 557, 561 (1961)). A cardinal change

> occurs when the government effects an alteration in the
> work so drastic that it effectively requires the contractor to
> perform duties materially different from those bargained
> for. By definition, then a cardinal change is so profound

> that it is not redressable under the contract, and thus renders the government in breach.

*AT&T Commc'ns*, *Inc. v. Wiltel, Inc.*, 1 F.3d 1201 at 1205 (quoting *Allied Materials*, 569 F.2d at 563-64).

A cardinal change is like a constructive change in that proof requires 1) work beyond the contract requirements, 2) which was ordered, expressly or impliedly, by the government, but "has two distinguishing features: ([3]) a cardinal change requires work materially different from that specified in the contract, and ([4]) a cardinal change amounts to an actual breach of contract." *Bell/Heery v. United States*, 739 F.3d 1324, 1335 (Fed. Cir. 2014). "Moreover, the contractor must prove facts with specificity that support its allegations that a cardinal change occurred." *PCL Constr. Servs., Inc. v. U.S.*, 47 Fed. Cl. 745, 804 (2000), *aff'd* 96 Fed. Appx. 672 (Fed. Cir. 2004). "In deciding whether a single change or series of changes is a 'cardinal change,' one must examine the work done in compliance with the changes and ascertain whether it is essentially the same work that the parties bargained for when the contract was awarded." *Gassman Corp.*, ASBCA No. 44975, 00-1 BCA ¶ 30,720 at 151,741-42 (ruling a contract for an addition to an existing building resulting in such, and change orders concerning items of the type already known to Gassman was not a cardinal change). A cardinal change can occur even when there is no change in the final product because "it is the entire undertaking of the contractor, rather than the product, to which we look." *Edward R. Marden Corp. v. United States*, 194 Ct. Cl. 799 at 810 (1971) (holding a cardinal change where defective specifications caused building to collapse and contractor was required to reconstruct the building, nearly doubling its costs). *See, e.g., P.L. Saddler v. United States*, 287 F.2d 411 at 414-15 (1961) (100 percent increase in amount of earth moved constituted cardinal change). *But see S.J. Groves & Sons Co. v. United States*, 228 Ct. Cl. 598, 602 (1981) (a fundamental change to the project resulting in a $6 million change to a $2 million contract was not a cardinal change). "Courts must look beyond simple arithmetic when assessing a cardinal change claim." *PCL Constr. Servs., Inc.*, 47 Fed. Cl. at 806 (citing *S.J. Groves*, 228 Ct. Cl. at 602).

The Board agrees with the government that appellant has not shown this work to be fundamentally beyond what the parties contracted for. In *Aragona Construction Co. v. United States*, the parties contracted for a hospital which "when it was completed, was in the same location, looked the same, had the same number of rooms and floors and the same facilities as the one shown on the original plans and specifications," and did not support a finding of a cardinal change. 165 Ct. Cl. 382, 391 (1964). The same is true here. While there are a great number of alterations made in the work through Field Change Requests, RFIs, and other documents, they are not out of character with the work contemplated in the contract, nor do they rise to a level of effort which could not be foreseen by the contractor when it bargained for the work,

8

as in *Marden Corp.*, 194 Ct. Cl. at 809. These changes often concerned similar work done in one of many ways to accomplish the same goal, resulting in the same final product.

In regards to ASBCA No. 62038, the WTs were installed in the original location intended, albeit under a different method and with extra measures to secure them in place. It is true that some needed to be relocated, but this is hardly a drastic consequence (SOF ¶ 6). Regarding ASBCA Nos. 62039 and 62040, appellant has alleged that additional weld passes and investigating the voids in the welds on the MPTA base plates took some number of months (SOF ¶ 10), but has not indicated it was on the critical path for the entire project, or that it was an amount of work exceeding what the contract contemplated. HPA has also fallen short of showing that a NASA directive required it to do the work at issue in ASBCA No. 62040, or that NASA had an affirmative obligation to inspect appellant's work which relieved it of its own obligation to do the work correctly, or relieved it of its commitments under its Quality Assurance Plan (SOF ¶ 2). ASBCA No. 62041 concerns pre-weld and post-weld heat treatments, which were addressed, by appellant's subcontractor (SOF ¶ 4). HPA fails to present any evidence that this was outside the type of work required by the contract. In addition, it does not explain how this is a change ordered by NASA. Finally, ASBCA No. 62042 concerns thermal movement of the test stand outside the limits allegedly prescribed in the contract, which appellant characterizes in its REA as a "constructive change" but does not explain how NASA ordered this change. This movement was more than appellant alleges it planned for when bidding, though it did plan for some thermal movement (SOF ¶ 2).

Significant questions remain as to the authority of the NASA officials signing the documents to which appellant points as the basis of NASA's orders to perform the work at issue. While this would present a disputed material fact, we need not reach it for purposes of this motion because the work at issue is not a drastic enough departure from the contract to merit a theory of cardinal change. This is true even supposing the 223-day delay appellant alleges was to the critical path, which appellant has not alleged. Appellant has not alleged any additional work outside the claims to support its cardinal change theory. Even if HPA received every dollar it claimed, these changes would amount to less than half of the cost of the original contract price.[3] As noted above, we do not rely on simple arithmetic alone, but these numbers are useful to get a sense of the magnitude of the allegedly additional work. No factor appears to be beyond the reach of the Changes clause, even when we aggregate the claims. We

---

[3] HPA argues the costs it claims "resulted in extra costs of more than 100% of the original HPA/QI subcontract amount of $8,300,000" (app. opp'n at 6). Even if appellant had broken down costs for RCE and QI individually, which it hasn't, HPA's subcontract is not the contract at issue and thus is irrelevant in this decision.

cannot say any of this indicates a change "so profound that it is not redressable under the contract, and thus renders the government in breach." *AT&T Commc'ns*, 1 F.3d at 1205 (internal citations omitted).

This is especially so in light of NASA's General Notes in its Drawings that they represent the original 1960s design incorporating "field observations" and directing the winning bidder to verify field conditions (SOF ¶ 5). *See PCL Constr. Servs., Inc.*, 47 Fed. Cl. at 805-06 (disallowing a cardinal change claim based in part on the contract explicitly allowing that discrepancies and omissions in the design specifications would likely arise).

As noted above, appellant has created a "Cardinal Change factors" list from two state cases. However, appellant does not discuss which factors it relies on, which factors it wishes us to focus on, nor how any of them apply to the fact pattern at hand (app. opp'n at 6-9). Indeed, several factors appellant provides appear to work against it. HPA relies significantly on its exhibit 6, and states "the evidence will show" various other points, but does not further elaborate how "the evidence" shows this (app. opp'n at 15-16). Exhibit 6 is a list of entries in the Rule 4 file titled "Overall Delay Exhibits" with no further explanation as to how these delays affected its critical path. Some of the documents referenced in Exhibit 6 go beyond the six REAs that otherwise form the basis of this theory, but which are related and which are not is not explained. Appellant has already received compensation for some of the work discussed (*see, e.g.,* app. opp'n ex. 6 at 3) (citing app. supp. R4, tab 57, appellant's REA #2); ex. 4 at 2 ("REA #2 was settled in the interim"). Thus we must disagree with appellant that unexplained references to various documents in the Rule 4 file sufficiently show delay related to the claimed work was so drastic as to, by itself, effectively render the government in breach.

Adding appellant's other five exhibits does nothing to alter this. Exhibits 1 and 5 are primarily appellant's Vice President and RCE's President discussing disagreements between the various parties and their characterizations of NASA's and HPA's intentions, often as answers to questions which have been edited out, further limiting their use. Exhibits 2 and 3 were submitted in response to the previously decided motions in this case, and concern an unrelated question addressed in those motions. Much of the rest is conclusory assertions, which we disregard. Exhibit 4, HPA's answers to interrogatories, add nothing to the analysis not found in the body of its opposition.

## CONCLUSION

For the reasons stated above, we deny the government's motion to dismiss appellant's sixth theory of recovery for a cardinal change for lack of jurisdiction. We grant the government's motion for partial summary judgment and deny appellant relief on that theory.

Dated: January 13, 2021

JOHN J. THRASHER
Administrative Judge
Chairman
Armed Services Board
of Contract Appeals

I concur

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

MICHAEL N. O'CONNELL
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 62038, 62039, 62040, 62041, 62042, Appeals of Harry Pepper and Associates, Inc., rendered in conformance with the Board's Charter.

Dated:  January 14, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals